The Chicago and Northwestern Railway Company, Appellee, *vs.* The Chicago Mechanics' Institute *et al.* Appellants.

*Opinion filed February 19, 1909—Rehearing denied April 8, 1909.*

1. RAILROADS—*changing location of depot is not changing terminus or re-locating road.* The changing of the location of a passenger depot in a terminal city to another point in the city on the line of road or adjacent thereto is not a changing of the terminus or the re-location of the road, such as is within the rule precluding such change of terminus or re-location of road after the company has once exercised its discretion in establishing the same.

2. EMINENT DOMAIN—*a railroad may condemn land for new depot site at terminus of road.* A railroad company may condemn land for a site for a new passenger station in a terminal city where the company has in good faith exercised a reasonable discretion in selecting the new site on its line of road or adjacent thereto with due regard to the necessities and convenience of the public, and where such new depot is required by the growth and demands of the company's business and the public needs.

3. SAME—*what is not a re-location of right of way.* The acquiring of additional land upon which to construct elevated tracks to a new terminal passenger station, which is the only practical way in which trains may enter and leave such station, is not a relocation of the railroad company's road nor a change of terminus, and the company has power to acquire such land by condemnation.

4. SAME—*when validity of ordinance cannot be made an issue in condemnation case.* The power of a railroad company to condemn land is derived from the statute and not from ordinances, and if a defendant in a condemnation proceeding is in no way injured by an ordinance vacating certain streets and alleys in the territory sought to be acquired by the petitioner he cannot make the validity of the ordinance an issue on the hearing to determine the amount of compensation to which he is entitled.

5. SAME—*allowance of separate trials is largely discretionary with trial court.* Whether or not separate trials shall be granted to the defendants to a condemnation proceeding is a matter resting in the discretion of the trial court, and in the absence of anything to show an abuse of discretion in denying a motion for a separate trial such action will not be interfered with by a court of review.

6. SAME—*party not asking for separate trial cannot complain that such trial was not given.* A defendant to a condemnation pro-

ceeding who fails to make a motion in the trial court for a separate trial cannot complain, on appeal, that a separate trial was not granted.

7. Same—*whether discretion was abused is determined by the facts presented when ruling was made.* In determining whether the trial court abused its discretion in refusing to grant a separate trial in a condemnation case the facts must be viewed as they were presented to the trial court at the time the ruling was made.

8. Same—*when the refusal to instruct jury to return verdict in names of defendants is not error.* It is not error to refuse to instruct the jury in a condemnation case to return a verdict as to certain defendants' interests in the names of such defendants instead of to the owner or owners of such interests, where no question of title was raised before the jury was empaneled and it is not clear but there may be other persons having claims on such interests, as is alleged in the petition.

9. Briefs—*briefs should not discuss facts outside the record.* It is not only improper practice but a waste of time of counsel and of the court to inject into briefs a discussion of facts outside the record.

Vickers and Farmer, JJ., dissenting.

Appeal from the Superior Court of Cook county; the Hon. Axel Chytraus, Judge, presiding.

This was a petition filed January 19, 1907, in the superior court of Cook county, by appellee, to condemn certain property, valued at over three million dollars, in the city of Chicago, for the purpose of building a new depot, and tracks by which to enter same. The jury fixed the value of the property of appellant the Chicago Mechanics' Institute at $44,444.44, and that of appellant James J. McCarthy at $56,010.49. From the judgment rendered on this verdict an appeal is taken by said two property owners to this court.

The main depot of appellee in Chicago is on the north side, at Wells and Kinzie streets. At the present time the tracks run west from the station, crossing the river by a bridge, and then separate into two divisions, the Galena division continuing west along Kinzie street and the Milwau-

kee division curving to the north. The proposed new station and tracks will take up all of the three squares bounded by Canal, Clinton, Madison and Lake streets and considerable of several squares to the north of these three. The plat here given shows approximately the present location of the tracks and depot and the changes proposed. Many of the details, however, are omitted, and in several cases only one line is shown to represent several railroad tracks. The space between Kinzie street and the south line of Carroll avenue, west of the river, is covered with numerous railroad tracks not shown on the plat, as is also the west bank of the north branch of the river:

It is proposed that the tracks of the Galena division, after running north from the new depot, shall curve to the

west and then run west parallel with the present Galena division tracks and about a block north of them, for about a mile, when they are to bend south and join the present tracks. It is also intended that the new tracks of the Milwaukee division shall run north from the depot and curve to the west, then run north-west for somewhat less than a mile, about two blocks west of the present tracks, afterward joining them.

The Chicago Mechanics' Institute claims a fee, subject to a ninety-nine year lease, in a tract on Canal street having a frontage of about forty-two feet on that street and running back about one hundred and fifty-one feet. Appellant McCarthy claims a fee, subject to a short term lease, in a tract having a frontage of about thirty-eight feet on Canal street. In November, 1906, the building thereon was partially destroyed by fire and had not been restored at the time the condemnation took place. The record in the case is very voluminous, containing over 3000 pages.

Craft & Stevens, for appellant James J. McCarthy:

The exercise of the power of eminent domain is an exercise of sovereign power to force a man to give up his property against his will and for a consideration fixed by others and is in its very nature harsh and against common right, and where such power rests upon statutes conferring the right, those statutes, being in derogation of common right, must be strictly construed, and the right cannot be exercised unless clearly conferred, and then only by strict compliance and conformity with the power conferred. *Railway Co.* v. *Galt,* 133 Ill. 657; Lewis on Eminent Domain, sec. 600; *Trust Co.* v. *Railway Co.* 218 Ill. 419; *Railroad Co.* v. *Wiltse,* 116 id. 449; *Harvey* v. *Railway Co.* 174 id. 295; Cooley's Const. Lim. (6th ed.) 649-651; *Railway Co.* v. *Chicago,* 138 Ill. 453; *Reed* v. *Railway Co.* 126 id. 48; *Goddard* v. *Railway Co.* 202 id. 362; *Gillette* v. *Railways Co.* 228 id. 261; *Railroad Co.* v. *Brownell,* 24 N. Y.

345; *Ramsey* v. *Railroad Co.* 114 id. 423; *Railroad Co.* v. *Albright,* 135 id. 83.

Where a railroad company has fixed the terminal point of its road in a town or city it cannot afterwards change the location. It may have a discretion as to its termini or the selection of its intermediate points, but when this power of location is once exercised it is exhausted and the company cannot change the location without legislative authority. *Railroad Co.* v. *People,* 143 Ill. 434; *People* v. *Railroad Co.* 120 id. 48; *Railroad Co.* v. *Chicago,* 149 id. 457; *Railway Co.* v. *Railway Co.* 211 id. 352; *Railway Co.* v. *Woodyard,* 226 id. 331; *Railroad Co.* v. *Suffern,* 129 id. 274.

The right to construct a branch or lateral road will depend upon the language of the charter or the provisions of the general law under which the corporation is organized, and such right does not exist where the power to build the branch road is not conferred by the charter, either in express terms or by necessary implication. The power to construct branches of a railroad is not incidental to the power to construct the road. *Railway Co.* v. *Railroad Co.* 149 Ill. 272; Pierce on Railroads, 495.

GEORGE W. BROWN, for appellant the Chicago Mechanics' Institute.

WILSON, MOORE & McILVAINE, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

The two appellants are interested in separate pieces of property and have brought to this court wholly distinct appeals. Several questions, however, are raised alike by and apply equally to both appellants. Such questions will be discussed as if they were but a single appeal. The chief question raised by both appellants is the right of the railroad company to condemn for the depot site in question ánd the right of way for the approaches thereto, which are partially shown on the map given in the statement of the case.

The appropriation of private property against the owner's will is an act which in its nature is harsh and against common right, and therefore the grant of power is to be strictly construed. (Lewis on Eminent Domain, sec. 600; *Chicago and Eastern Illinois Railroad Co.* v. *Wiltse,* 116 Ill. 449; *Harvey* v. *Aurora and Geneva Railway Co.* 174 ·id. 295; *Gillette* v. *Aurora Railways Co.* 228 id. 261.) The question is clearly one of legislation. Legislative authority might, if it saw fit, prohibit or grant expressly the right to change the location of a passenger station. Whether reasonably exercised or not, the control of such matters is in the legislature and the courts must be governed accordingly. This doctrine is conceded by all counsel in the case, but it is argued by appellants that under the general powers granted to railroad companies, and appellee's charter, it had no right to condemn land for the proposed depot in Chicago, and cannot do so without additional legislation. If appellee has no authority to obtain the land for the depot and approaches in question, then it necessarily follows that the contention of counsel for appellants must be upheld that until such authority has been obtained in the proper way the acts of the company are contrary to law and utterly void and cannot be justified even upon the ground of public need.

This court has repeatedly laid down the rule that "where the termini and general route of the railroad are prescribed by the charter, leaving the determination of details to the discretion of the corporation, the power of the company to fix the location is exhausted after such discretion has been exercised." (*Cairo, Vincennes and Chicago Railway Co.* v. *Woodyard,* 226 Ill. 331, and cases there cited.) It cannot thereafter re-locate its road or change its termini without statutory authority and is without power to condemn land for such purposes. If the building of this depot is the changing of one of the termini of the road or if the construction of these approaches is a re-location of the road, as laid down in the authorities cited in the case last referred to,

then appellants' contention must be upheld. It is very evident, however, from a reading of these decisions, that they do not uphold appellants' position as contended. Some of these authorities, such as *People* v. *Louisville and Nashville Railroad Co.* 120 Ill. 48, and *Illinois Central Railroad Co.* v. *People,* 143 id. 434, hold that where a railroad company has fixed its terminus in a town or city it cannot afterward change the location from that town or city, and while there may be expressions in both of those cases, and in others, which, taken by themselves, tend to uphold the contention of appellants that by the terminal point of a railroad is meant the depot as located, it is clear from a consideration of the entire cases that the doctrine laid down was that the terminus having been fixed at a city or town could not be removed therefrom, and not that the depot, having been once located within the city or town, could not be changed to another location on its line of road or adjacent thereto within the same city or town. The power granted under a railway charter to fix its terminus at Chicago authorized a company to locate its tracks and fix its terminus at any point in said city, as "Chicago" includes every part of Chicago. (*Chicago and Northwestern Railway Co.* v. *Chicago and Evanston Railroad Co.* 112 Ill. 589; *Ligare* v. *Chicago, Madison and Northern Railroad Co.* 166 id. 249.) Neither does the construction of new switch tracks or side-tracks, or even a new track as a part of the main line, necessarily mean a re-location of the railroad. (*Lake Shore and Michigan Southern Railway Co.* v. *Baltimore and Ohio and Chicago Railroad Co.* 149 Ill. 272; *Chicago and Milwaukee Electric Railroad Co.* v. *Chicago and Northwestern Railway Co.* 211 id. 352.) Whether appellee has a right to condemn the land for this new depot site, and the approaches thereto, under the statute and its general charter power, depends upon whether such depot site is required for its business and the public needs, as shown in this record. As was said in *Cairo, Vincennes and Chicago Railway Co.*

v. *Woodyard, supra,* (p. 337,) quoting from Randolph on the Law of Eminent Domain: "A railroad company may continue to condemn for such incidental uses as the growth of business demands."

In *Chicago, Burlington and Quincy Railroad Co.* v. *Wilson,* 17 Ill. 122, this court said (p. 125): "We must presume that the law-makers had a general knowledge of what accessories were necessary to the convenient operating of a railroad. * * * There can be no doubt that they intended to embrace all such conveniences as would be necessary for the successful conduct of the business of the road, as depots, repairing shops, and the like, under this general designation, without particularly specifying either." And again it is stated (p. 127): "It would be a disastrous rule, indeed, to hold that a railroad company must, in the first instance, acquire all the grounds it will ever need for its own convenience or the public accommodation. * * * We are of opinion that the company still has the right to acquire such lands as it may need for the accommodation of its business, from time to time, by the coercive process pointed out by the law."

In *Marsh* v. *Fairbury, Pontiac and Northwestern Railway Co.* 64 Ill. 414, we said: "The location of railroad depots has much to do with the accommodation of the wants of the public, and when once established a change of affairs may require a change of location in order to suit public convenience. * * * Railroad companies, in order to fulfill one of the ends of their creation,—the promotion of the public welfare,—should be left free to establish and re-establish their depots wheresoever the accommodation of the wants of the public may require."

In *Fisher* v. *Chicago and Springfield Railroad Co.* 104 Ill. 323, it was held that the law does not require a railroad to acquire all the land necessary for the construction and operation of its road at the same time,—it may increase its facilities as the business of the country may require.

In. *People* v. *Chicago and Alton Railroad Co.* 130 Ill. 175, it was stated (p. 182): "It is undoubtedly the rule that railway companies, in the absence of statutory provisions limiting and restricting their powers, are vested with a very broad discretion in the matter of locating, constructing and operating their railways and of locating and maintaining their freight and passenger stations. This discretion, however, is not absolute, but is subject to the condition that it must be exercised in good faith and with a due regard to the necessities and convenience of the public."

In *Mobile and Ohio Railroad Co.* v. *People,* 132 Ill. 559, it was held that the location of stations for the receipt and discharge of passengers "at points most desirable for the convenience of travel and business is alike indispensable to the efficient operation of the road and the enjoyment of it as a highway by the public;" that it necessarily follows that "the company cannot be compelled, on the one hand, to locate stations at points where the cost of maintaining them will exceed. the profits resulting therefrom to the company, nor allowed, on the other hand, to locate them so far apart as to practically deny to communities on the line of the road reasonable access to its use. The duty to maintain or continue stations must, manifestly, rest upon the same principle, and a company cannot, therefore, be compelled to maintain or continue a station at a point when the welfare of the company and the community in general requires that it should be changed to some other point. * * * The power of locating stations, * * * from its very nature, is a continuing one."

This court in the recent case of *Chicago and Eastern Illinois Railroad Co.* v. *People,* 222 Ill. 396, reviewed at length most of the authorities referred to in the briefs, and then stated (p. 410): "The change in situation, circumstances and surroundings of innumerable kinds will readily suggest that there must be power somewhere to change the location of such stations, and, as has been said by the courts,

the common interests of the railroad company and of the community at large properly place that power in the railroad company, to be exercised reasonably and from proper motives." In that case it was held that the railroad company possessed the authority to change the location of its depot within the city of Danville, and while that was a *mandamus* proceeding, we think the rules of law therein stated apply with equal force in condemnation proceedings. If the railroad company has the right to abandon one depot site for another, necessarily it has the authority to condemn land for the new depot site.

It is conceded by counsel for appellants that under its charter powers appellee could condemn land to the west and east and adjacent for enlarging its present station at Wells and Kinzie streets, and it was also stated by at least one of the counsel for appellants in the oral argument before this court that appellee would have a right to condemn land for a depot site immediately adjoining its present right of way, west of the north branch of the Chicago river. We think the evidence shows conclusively that it is impracticable to enlarge the depot facilities at the present location at Wells and Kinzie streets. The elevated railway in Wells street renders it out of the question to extend the depot in an easterly direction, and the proof shows that from a railroad standpoint it would be very impracticable, if not entirely impossible, to give proper depot facilities without extending east of Wells street. But even if sufficient land could be obtained at that point, the evidence shows, without controversy, that the delay caused by the opening of the railroad bridge across the north branch of the Chicago river, rendered necessary by the frequent passage of boats in that river, is an insurmountable obstacle in the way of appellee increasing the depot facilities at its present site. The proof is to the effect that appellee has about 7600 miles of railway, reaching into nine different States in the west and north-west, and that it owns proprietary interests in the

Chicago, St. Paul, Minneapolis and Omaha railroad, which has about 2000 miles of railway; that appellee has in the city of Chicago, aside from its side-tracks, some fifty miles of railroad and fifteen passenger stations; that out of the Wells street depot run daily 326 regular trains, about two-thirds being suburban and the other one-third running beyond fifty or seventy-five miles; that 45,000 passengers a day go in and out of that station; that two-thirds of them come from a radius of fifty miles from Chicago, one-sixth from within one hundred and seventy-five miles and one-sixth from two hundred to five hundred and three thousand miles; that in 1900 there were 25,000 passengers per day in and out, and that the number is increasing now at the rate of ten per cent a year; that in the morning and evening, when the suburban trains are numerous and run very close together, if the railroad bridge crossing the north branch is opened it is liable to take hours before the trains can again leave the depot on schedule time. The testimony also tends strongly to show that the proposed location, taking into consideration the public interests, is as near the present depot at Wells street as any location for a new depot that can be obtained. It may be noted in passing that the record shows that appellee does not intend to abandon its present Wells street depot, but will use it for some of its trains. Land adequate for the present and reasonable future needs of appellee for the proposed new passenger station must necessarily include space at which passengers are received and discharged in the depot proper and where the trains stand in loading and unloading, as well as the tracks or communicating cross-tracks extending for a considerable length out of the station proper. The evidence shows that many of these tracks are required to be from one thousand to fifteen hundred feet in length to provide proper standing room for the trains arriving and departing. The present right of way of the appellee west of the north branch of the Chicago river extends southward from Kin-

zie street, as shown by this record, about a half a block. For three-quarters of a block south of this right of way the land is occupied by the railroad tracks of other railroads,— that is, the land west of the river is substantially taken up by the railroad rights of way from and including a part of Kinzie street south between one and two blocks. It is proposed to locate the depot on Madison street, between Canal and Clinton streets, and the depot sheds and tracks immediately north. The evidence is that the depot, and the tracks for loading and unloading passengers, and the communicating cross-tracks, will necessarily occupy at least three blocks. The block between Madison and Washington streets is four hundred feet long. More than half of this will be devoted to passenger facilities and cannot be occupied by tracks. The other two blocks are substantially the same length. The evidence shows that the structure of the Chicago and Oak Park Elevated Railroad Company is in Lake street, three blocks north of Madison, and it would be out of the question on this account to locate the depot proper even a block further north than proposed. We think the evidence also shows conclusively that it would be impossible, on account of the location of railroads and streets, including the viaduct on Milwaukee avenue across the railroads in question, to obtain a practical location north of Kinzie street, adjacent to the present right of way, that would serve the needs of appellee or the public. Such location would not compare, in accessibility to the public, either by street cars or in any other manner, with the proposed location. The evidence shows that a proper site for the depot facilities required could not be obtained, all things considered, nearer the depot at Wells and Kinzie streets, or nearer the present right of way of appellee, than the site proposed. This location, while not touching the present right of way, is adjacent. "Adjacent" is defined in the Century Dictionary as "lying near; neighboring, but not necessarily in contact." The Standard and Webster's Dictionaries define the

word substantially the same. Worcester says: "What is adjacent may be separated by the intervention of some other object." In *People* v. *Keechler,* 194 Ill. 235, this court said (p. 240): "The word 'adjacent' is defined by Webster and other lexicographers to mean, 'to lie near;' 'close, or contiguous.' It is sometimes said to be synonymous with 'adjoining,' 'near,' 'contiguous.' In some decisions courts have held it to mean 'in the neighborhood or vicinity of;' in others, 'adjoining or contiguous to.'" And after citing authorities the opinion continues: "It has no arbitrary meaning or definition. Its meaning must be determined by the object sought to be accomplished by the statute in which it is used. This consideration manifestly controlled each of the courts in the interpretation placed upon the word in the cases cited." See, also, as laying down the same rule, 1 Am. & Eng. Ency. of Law, (2d ed.) p. 633, and cases cited; 1 Cyc. p. 764, and cases cited. On this record the conclusion is inevitable that appellee exercised in good faith a reasonable discretion, with due regard to the necessities and convenience of the public, in locating the proposed depot site; that such new depot is required by the growth and demands of appellee's business, and that therefore appellee has under its general charter powers the authority to condemn this land.

As the property of each appellant is a part of the proposed depot site, appellee insists that appellants cannot raise the question as to the right to condemn the right of way for the approaches. Without passing on that question, we deem it sufficient to say that the proof shows that the only practical way of entering the proposed new depot is by an elevation of appellee's tracks, and that, on account of the railroad rights of way immediately south of its present tracks west of the river, it is necessary to begin the elevation some distance north of its present right of way at this point, thus requiring additional right of way for approximately a mile west along the main line of appellee running

west and for a little less distance along the tracks of appellee approaching from the north. We think the evidence shows, without any contradiction, that this elevation of tracks, and the additional right of way proposed to be obtained therefor, are required to reach and enter the new depot. As we have seen, appellee has the right to locate its depot at its present site. It therefore follows that it has the necessary power to condemn for the additional right of way required for the elevation of its tracks in order that its trains may enter and depart from said depot. This is not a re-location of the right of way of the railroad or a change of its terminus. These conclusions render it unnecessary for us to consider whether, under its charter, appellee has the specific power to re-locate its tracks.

Appellants further contend that an ordinance passed by the city council of the city of Chicago providing for the vacation of certain alleys in the rear of the premises condemned in these proceedings in which they are interested was void, as it is claimed said city had no right or authority, under the law, to vacate said alleys and give possession to the appellee. The existence of the alleys and the facilities thereby afforded enhanced the market value of the premises, but as we understand this record the evidence in this condemnation proceeding as to the value of these premises was offered on the basis of their value with the existing alley, including the facilities of access thereby furnished. We do not find it necessary to consider or decide the question on this hearing whether this ordinance is void. But even if it be conceded, for the sake of the argument, that the ordinance is void, it is immaterial to these appellants, since the right of appellee to condemn this property does not depend upon this ordinance. The right and the power of a railroad company to condemn private property within the limits of a city is derived from the State under the statutes, and not from the city authorities by municipal ordinance. (*Chicago and Western Indiana Railroad Co.* v. *Dunbar*, 100

Ill. 110; *Chicago and Northwestern Railway Co.* v. *Chicago and Evanston Railroad Co. supra; Tudor* v. *Rapid Transit Railroad Co.* 154 Ill. 129, and cases cited.) As appellants were not injured in any way by the ordinance in question its validity cannot be made an issue in the present hearing.

Counsel for appellants further contend that the court committed reversible error in refusing to grant their clients separate trials, and that by this refusal they incurred great and unnecessary expense; that the motion for separate trial was heard and denied September 4, 1907; that approximately some three weeks thereafter was consumed in taking evidence and hearing arguments on motion to dismiss the petition on the ground that appellee was without the right to condemn; that the jury was not obtained to try the cause until about the first of November, when several days were occupied by them in viewing the premises, and that thereafter the evidence began November 7, 1907, and continued, with some interruptions, until March 7, 1908; that some ten days were then consumed in arguments of counsel to the jury, and thereafter the jury took more than two weeks to consider the questions before a verdict was returned. The argument of appellants is to the effect that if their cases had been tried separately each would have taken but a few days. It goes without saying that it was an advantage to the property owners to have all the evidence on the legal objections heard before the court ruled on the question of appellee's right and authority to condemn, and the only point necessary to be considered is the right of a separate trial before the jury. Paragraph 2 of section 5 of chapter 47, on eminent domain, (Hurd's Stat. 1908, p. 1027,) provides that "any number of separate parcels of property, situate in the same county, may be included in one petition, and the compensation for each shall be assessed separately, by the same or different juries, as the court or judge may direct." Whether or not a separate trial should

be allowed in cases of this character is discretionary with the court, and in the absence of anything to show an abuse of that discretion in refusing to grant a separate trial the action will not be interfered with in the reviewing court. *Eddleman* v. *Union County Traction Co.* 217 Ill. 409, and cases there cited.

Counsel for appellant McCarthy state in their original brief that a motion for separate trial was made in behalf of their client, but they fail to point out, by reference to the abstract or record, where such motion can be found, and in their reply brief they practically admit that no such motion was made in his behalf. While they do refer to a page of the abstract where certain motions for a separate trial are found, a reference to that page does not show appellant's name. The abstract simply states that an order was entered denying motions for separate trial to certain property owners, without naming them. An examination of the record shows that appellant McCarthy was not a party to such motions. Counsel, however, contend that even though such motion was not made by him, it was the duty of the court, of its own motion, because of the magnitude of the cause, the great number of pieces of land, the immense value of the property and the conflicting interests, to divide up the tracts of property into several sections and require trial of each section before a different jury. This is not our view of the law. The practice in this court has been uniform that a property owner could not complain that a separate trial was not granted unless the motion was made on his behalf for such separate trial, and we said in *Martin* v. *Chicago and Milwaukee Electric Railroad Co.* 220 Ill. 97, that "in order to enable the court or judge to exercise understandingly the discretion conferred by the statute the reasons for a separate trial should be presented in some proper form, and in order that this court may determine whether or not the discretion of the court has been abused in any particular case such reasons should be preserved in

the record for our consideration.". Appellant McCarthy not having asked for a separate trial cannot for the first time raise that question in this court. It needs no argument to prove that a large number of property owners, with a common purpose, could obtain their evidence as to the value of their respective interests, and could retain counsel to represent them, at much less expense by combining together than if each tried his own parcel or interest separately. If each property owner had his separate interest tried separately there would have been several hundred trials, taking, possibly, years. This might have been a great hardship to some of the property owners, for in the meantime they would be obliged to wait for the payment of their money, and since their titles were involved in the litigation they might have been unable to find tenants or make adequate use of their property.

The Chicago Mechanics' Institute made application for separate trial, stating in an affidavit in support thereof that its interests were separate and distinct from those of all other owners described in the petition; that it was a hardship to be present throughout the trial, and that the trial of the issues as between the petitioner and the defendant would occupy only a short time; that the jury ought not to be influenced by the testimony taken on the other issues raised in the case. It appears from the pleadings that the Chicago Mechanics' Institute claimed to own the record title to the south half of lot 1, block 50, in the original town of Chicago, subject to a ground lease of ninety-nine years to Jonathan Clark, commencing April 1, 1888. The petition of the appellee also sets up that other parties are interested in said premises. The cross-petition of appellant the Chicago Mechanics' Institute alleged that the buildings erected thereon by Jonathan Clark under his said lease were the property of said institute. This was denied by the heirs of said Clark, and the court found that said buildings belonged to the estate of said Clark and that said institute had no interest in

said ninety-nine year lease. The parties interested in the estate of Jonathan Clark were made parties to the condemnation proceedings. It is not entirely clear from the record whether the jury were called upon to settle the interests of these heirs in this lease. As we understand from the statements made in the briefs and oral argument, the heirs of Clark, and those interested in this leasehold interest, some time during the trial sold their interests to appellee, and therefore the jury were not required to render a. verdict as to the value of such interests. But it is contended by appellee (and so far as this record discloses it tends to support such contention) that at the time the Chicago Mechanics' Institute asked for a separate trial and the court ruled thereon the parties who were interested in such leasehold interest were still parties to the condemnation proceedings, and appellee contends that a separate trial could be asked only for separate parcels of property, and not a separate trial as to each separate interest in each parcel or tract. This precise question does not seem to have been decided by this court. It has been held that one of the parties in interest in a given piece of property may have his interest condemned before all the other parties are brought into court. *Bowman* v. *Venice and Carondelet Railway Co.* 102 Ill. 459; *Dowie* v. *Chicago, Waukegan and North Shore Railway Co.* 214 id. 49; *Stubbings* v. *Village of Evanston,* 136 id. 37.

Even if it be conceded (which we do not decide) that the court would be justified, on a proper showing, in granting a separate trial to a separate interest in a tract or parcel of land when all interests in said land were in court, we do not think the showing made by the appellant the Chicago Mechanics' Institute was sufficient to justify granting it a separate trial. It is quite apparent from this record that at the time this trial was begun there was no expectation on the part of any of the litigants that it would consume as much time as it did, and on the question whether

the court abused its discretion as to allowing a separate trial
we must view the facts as they were presented to the court
at the time it made the ruling. Furthermore, there is no
showing on this record that the Chicago Mechanics' Insti-
tute was injured in any way by this ruling. While the brief
states the number of days counsel was required to appear
in court, the record does not disclose that it was necessary
for the appellant institute to be in court any such length
of time. So far as we can find from the record itself, the
time consumed in the taking of evidence before the jury
as to the property interests of the Chicago Mechanics' In-
stitute did not consume more than a week or ten days; and
even if it be conceded that it took three times ten days,
this court would have no right to assume, as a matter of
law, that it was an injury to the interests of said Chicago
Mechanics' Institute. The record does not disclose any re-
quest made by counsel for either appellant that the evidence
as to his respective interest might all be introduced at or
about the same time, or any ruling by the court that such
evidence might not be introduced at the convenience of
counsel. It is quite apparent from the statements made in
the oral arguments, as well as in the briefs, that the ques-
tion of the value of many pieces of property involved at
the beginning of the jury trial was not submitted to the
jury because settlements were made during the trial, and
while there is nothing in this record to show clearly just
how many parcels of property or interests there were con-
cerning which the jury did finally return a verdict, according
to the statements made in the briefs of appellants as to the
closing arguments made by various counsel, nineteen coun-
sel spoke for property owners representing some twenty-
three or twenty-four different interests. If this be a correct
statement, then there is no force in the argument that the
jury were required to pass on so many different interests
that it would be impossible for them to decide intelligently.
Counsel for the appellant McCarthy recognize that it would

have been an abuse of the discretion of the trial court to permit or order a separate trial for each separate interest of the some eight hundred different parties they allege were involved in these proceedings, as they insist only that the court should have separated the various parcels of property into several sections or groups and provided that each group of said properties should be tried by a separate jury. Such a suggestion, however, as to subdividing the property interests into different groups was not made by counsel for either appellant, and so far as we are advised no such suggestion was made by anyone during the trial. On the contrary, the Chicago Mechanics' Institute asked for a separate trial for its special interest only in one parcel of land. Manifestly, the court could not reasonably grant such a motion without granting a like motion as to every other separate interest involved in said proceeding, if requested. The trial court could not, in justice to the public or the various property interests involved in this proceeding, grant a separate trial to each of several hundred separate interests.

The further contention is made that reversible error was committed by the court in refusing to give instructions in behalf of each appellant that the jury should return a verdict as to such appellant's interests in the name of such appellant, and not to the owner or owners of the interest in question. The petition stated that the Chicago Mechanics' Institute was the owner of the record title in the property in question and that certain other persons (naming them) were interested in said property, and also that there were other persons, who were unknown to the petitioner, who were interested. Substantially the same statement was made as to the property in which McCarthy was interested. In condemnation cases the jury are empaneled merely to ascertain and report the just compensation to the owner of the property sought to be taken or damaged. No issue as to the ownership can be presented to the jury. The question of title, if any, is preliminary to the submission of the ques-

tion of damages to the jury. The proper practice is to require all persons claiming an interest to litigate and settle their interests in the property prior to empaneling the jury. (*Metropolitan Elevated Railway Co.* v. *Eschner,* 232 Ill. 210; *Chicago and Northwestern Railway Co.* v. *Miller,* 233 id. 508.) The statute requires the petition to set forth all persons interested in the premises, so far as is known, and that was done in this case, but the petitioner is not bound to pass upon the title of the claimants. (*Thomas* v. *St. Louis, Belleville and Southern Railway Co.* 164 Ill. 634.) While this question of title should have been settled first, no such question was raised before the jury was empaneled, and it is very plain from this record that the failure to so settle the titles did not affect the amount of the verdict. The trial court can, on motion, at any time in the future, settle to whom this money is to be paid. On the facts in this record there may still be a dispute concerning each of these properties as to the ownership of the interests involved. The case of *Convers* v. *Atchison, Topeka and Santa Fe Railroad Co.* 142 U. S. 671, we do not consider in point. In that case there was no dispute as to the ownership, and the court held that the trial court should have entered judgment in favor of the property owner without requiring him to make a motion at a later hearing, but held also that the mistake in entering the judgment did not require a new trial, and remanded the cause with specific directions to enter judgment in favor of the property owners for the amount of damages found by the jury. Taking this decision in its most favorable light for appellants, the only thing that would be required by this court (if there were no question unsettled as to the ownership of these two interests) would be to remand the cause, with directions to the trial court to enter judgment in favor of the respective appellants for the amounts found by the verdict of the jury. This, as we have seen, cannot be done in this case, because it is not entirely clear from the record that other parties are not interested.

It is insisted that the court erred in the admission and exclusion of evidence as to the value of the interest of the appellant the Chicago Mechanics' Institute. It appears from this record that the interest that said appellant claimed to own was subject to a ninety-nine year lease, which, at the time the petition in this condemnation proceeding was filed, had approximately eighty years still to run. Under this lease the owner of the fee was to be paid an annual rent of $2000. The appellant institute asked two of its witnesses what was the front foot value of the land in question, including not only the fee but the ninety-nine year lease also. This question was objected to and the objection sustained. We do not think the court erred in this ruling. Said appellant was not interested in what the ninety-nine year lease was worth.

In this connection the appellant the Chicago Mechanics' Institute further contends that the jury, in reaching their conclusions as to the value of this fee subject to the lease, did not follow the correct line of reasoning. All of the witnesses, both for this appellant and for appellee, testified that one of the methods used and accepted in Chicago in ascertaining the market value of such interests was to capitalize the ground rent on a percentage basis, at the rate of interest the purchaser or investor wished his investment to bear,—that is, if the investor wished his investment to bear a rate of interest of five per cent he would only be willing to pay for this fee $40,000, which amount at five per cent interest would equal the $2000 rental. If he wanted to make an investment at four per cent he would be willing to pay $50,000, as the $2000 annual rental would be equal to four per cent interest on $50,000. If, however, he was satisfied to have his investment bring him only three per cent interest he would be willing to pay $66,666.66. Six witnesses for appellee testified that fees subject to leases of this character, in such surroundings in Chicago as this property, would usually sell for five per cent on the investment,

and therefore the market value of this fee, subject to the lease, would be worth $40,000. Two witnesses for the appellant institute testified that the capitalization method would be one element to be considered in making up the value of the freehold, subject to the lease, and both testified that investors could be found to purchase this fee who would be willing to pay $60,000, fixed as the basis upon which they were to receive payment of the interest,—that is, a trifle over three per cent interest on their investment,— and that, in addition, the right to the reversion after the ninety-nine year lease had expired would have a market value, both of them estimating the present market value of this reversion at $20,000. One witness for the appellant institute, of wide experience in handling properties of this kind, testified, on cross-examination, that a fee, subject to a ground lease, in Chicago is regarded and sold on the basis of a security for the investment; that the thing which either the purchaser of such a fee or the lessor in such a ground lease looks at is the income he gets on the money; that the only test of value on a given ground lease with a known rental is the income which can be produced on the investment and the certainty of the payment; that the certainty of its payment is determined by the nature of the building on the property; that if there is a building on the property owned by the tenant which is adequate security for the rental, that kind of a fee always sells in the market in Chicago on the basis of the income it will produce; that except in particular cases, like the sale of a fee by the landlord to the tenant, the test is the income to be produced on the investment; that the reversion after the termination of the ground lease is not regarded as an element of value unless the lease expires in the very near future,—say ten or fifteen years; that it is a general fact that more ground leases have been made and sold during the last forty years in Chicago at five per cent than any other rate. All of the evidence on this question was admitted for the consideration of the jury,

and they found the value of this fee, subject to the lease, $44,444.44. The rent, $2000, would equal four and one-half per cent on that amount.

It is insisted that the court improperly excluded the answer to a question asked witness Hosmer by the appellant the Chicago Mechanics' Institute as to what the present value of the rents to accrue from the building on said property amounted to. This witness stated that he had no experience in dealing with or knowledge as to fees subject to such leases in Chicago. The court held,—and the holding is not questioned,—that the building belonged to the owner of the leasehold interest and not to the owner of the fee. It was admitted by counsel for appellee on the trial before the jury that the building was ample security for the $2000 annual rental, and the question for the consideration of the jury as to the value of this leasehold interest was not the present value of the rents that would accrue during the life of the leasehold from the building of the property. That, as the witnesses all state, could have no bearing on the value of this fee if the security was ample for the payment of the annual rental. The question asked called for simply a computation by the rules of arithmetic of the present value of the rents. The court did not err in refusing to allow the question to be answered. The appellant institute insists that the jury should have followed the rule laid down by this court in *Corrigan.* v. *City of Chicago,* 144 Ill. 537, where we said, in considering a different state of facts, with a shorter lease, that the proper rule to find the interest of the lessor in premises subject to a lease is the value of his reversion and the rents,—that is, the reversion with the rents added. As we have stated, the Chicago Mechanics' Institute was permitted by the court to introduce evidence in accordance with this rule and cannot complain of any rulings of the court in this regard.

We cannot draw any positive conclusions as to the method adopted by the jury in reaching its verdict on the

value of this fee, subject to the lease, but we are inclined to believe they figured the reversion as having no value. We are not prepared to say that they were wrong in so doing. Whether this reversion is of any value must be largely speculative. It cannot be concluded with any certainty that the property in question will increase in value as the years go by. Judging the future of Chicago by the history of other cities, this property three-quarters of a century from now may be worth much less than it is at present. The great weight of the evidence is to the effect that the reversion under such long term leases is not considered in deciding the market value. The jury visited the property and fixed the value of land taken well within the range of the testimony. They were fairly instructed on all points, and we cannot say that their verdict was the result of passion or prejudice.

Appellants are in no position to urge certain other errors assigned. The action of the trial court of which they complain was induced by themselves, and hence cannot be reviewed here.

Counsel for appellants, in support of their argument to show that a fair trial was not had, have stated several facts which they concede are not shown by the record and which are denied in the brief of counsel for appellee. Appellee's counsel have also stated certain facts which they concede are not in the record and which are disputed by opposing counsel. All counsel in this case are lawyers with years of experience, and it needs no suggestion from the court for them to appreciate that we can only decide on the facts shown in the record. It is not only improper practice, but a waste of time of counsel and the court to attempt to inject into briefs a discussion of facts outside the record. We have not deemed it necessary to take up and discuss such disputed questions. We think we have considered and disposed of all other questions raised. On the record before us we find nothing that would justify reversal of this cause.

The judgment of the superior court will be affirmed.

*Judgment affirmed.*

Mr. Justice Vickers, dissenting:

I do not concur in the opinion of the majority in holding that the railroad company has the power to condemn land for a new depot site and for branch lines extending from the old line of road to such new depot site. In my opinion the fundamental error of the majority opinion results from the assumption that the establishment of the proposed depot and the lines of railway necessary to connect such depot with the original line is not a re-location. The evidence is undisputed that the proposed depot site is several blocks from the Wells street depot, and that it is not connected with or adjacent to any line of railroad or right of way belonging to the railroad company, and that it can only be reached by the construction of two branch lines of road through the city of Chicago of an aggregate length of between three and four miles. As I understand the majority opinion, while seeming to hold that the power of the railroad company to condemn is limited to such additional real estate as may be necessary and adjacent to its other property, yet it in fact holds that if the physical situation of the land adjacent to the present right of way is such that it is inconvenient or very expensive to condemn such adjacent property, that affords a reason for extending the right to condemn to the nearest convenient site. It seems to me that the law must be regarded as firmly established in this State that a railroad company has exhausted its power after having exercised its discretion in the location of its line of road and termini, and the company can not change such location without additional legislative authority. Such is the holding of this court in *People v. Louisville and Nashville Railroad Co.* 120 Ill. 48; *Chicago and Alton Railroad Co. v. Suffern,* 129 id. 274; *Snell v. City of Chicago,* 133 id. 413; *Illinois Central Railroad Co. v. People,* 143 id. 434; *Chicago, Burlington and Quincy Railroad Co. v. City of Chicago,* 149 id. 457.

I regard the majority opinion as in conflict with all of the foregoing decisions. The power of a railroad company to exercise the right of eminent domain for the purpose of condemning, from time to time, such additional and adjacent land as may be necessary in order to enable the company to properly discharge its duties to the public is undoubtedly a continuing power, and may be exercised whenever it becomes necessary to enlarge the facilities of the company to enable it to properly discharge its duties as a common carrier. But while this power is recognized as continuing, I am unable to find any warrant in the cases cited in the majority opinion, or in any others to which my attention has been called, for the exercise of such power for the purpose of locating and establishing an entirely new, separate and distinct terminal station and depot and for the condemnation of right of way for branch lines to reach such new station. It is absurd to say that the proposed new station is adjacent to the other property of the company, since new branch lines of road must be constructed in order to reach and use such new station. If a railroad company can locate a new station and build a branch line two miles long to reach it, why may it not build one five miles or ten miles long for the same purpose, if it can be shown that it is more convenient and cheaper to re-locate such station at such point than it would be to acquire sufficient land to enlarge the old station? When once the claim is recognized that railroad companies can re-locate stations off the original lines of their roads the safeguards heretofore supposed to protect the right of private property are broken down, and there is no limit to which the power may be exercised except the limit fixed by the convenience and necessities of the railroad companies.

The branch lines proposed to be built to reach the new station in question diverge from the old line at slight angles, but if it were cheaper to locate the station at such point in the city of Chicago to reach which it would be necessary to

build branch lines running at right angles from the old line, under the reasoning of the majority opinion it would be legal and proper to so locate such station and line.    The majority opinion is inconsistent with itself.    The uncontroverted facts in the case, if applied to the rules of law laid down in the majority opinion, would necessarily lead to a reversal of the judgment below.    In commenting on *People* v. *Louisville and Nashville Railroad Co. supra,* and *Illinois Central Railroad Co.* v. *People, supra,* it is said that those cases "hold that where a railroad company has fixed its terminus in a town or city it cannot afterwards change the location from that town or city, and while there may be expressions in both of those cases, and in others, which, taken by themselves, tend to uphold the contention of appellants that by the terminal point of a railroad is meant the depot as located, it is clear from a consideration of the entire cases that the doctrine laid down was that the terminus having been fixed at a city or town could not be removed therefrom, and not that the depot, having been once located within the city or town, could not be changed to another location on its line of road or adjacent thereto within the same city or town."

It will be seen from the foregoing quotation that the limit of the right of the railroad company is to re-locate a new depot site *"on its line of road or adjacent thereto."* The proposed depot site is neither on the line of appellee nor adjacent thereto.    As already shown, it is several blocks from the old station and from any of appellee's right of way.    The proposed new site is separated from appellee's line of road by two other railroads, which must be crossed by branch lines to reach the new station.    In *Tudor* v. *Rapid Transit Railroad Co.* 154 Ill. 129, this court held that a right to condemn a strip of land thirty feet wide, "immediately adjacent to and parallel with a certain alley," only authorized the company to take a strip thirty feet wide from the west line of said alley, the company having elected

to build on the west side of said alley, but would not authorize the company to condemn other land either west or east of the thirty-foot strip. Lands are "adjacent to each other when the two bodies, taken together, form a compact tract." (*People* v. *Keechler,* 194 Ill. 235.) "Adjacent" is synonymous with "abutting," "adjoining," "attached," "beside," "bordering," "close," "contingent," "neighboring," "next" and "nigh." (1 Words and Phrases, p. 185.) Thus it will be seen that while the majority opinion holds that appellee has no right to condemn land for a station except on a line of its road or adjacent thereto, it affirms a judgment condemning lands that are neither on the line of road or adjacent thereto.

Again, it is said in the majority opinion: "Whether appellee has a right to condemn the land for this new depot site, and the approaches thereto, under the statute and its general charter power, depends upon whether such depot site is required for its business and the public needs, as shown in this record." This announcement of the law will no doubt be a great surprise to the legal profession, and especially to those who have on behalf of railroad companies exhausted their abilities to find some way by which the right of eminent domain could be exercised without express statutory authority, where the exigencies of corporate business and the public needs made it highly desirable that such right should be exercised. Under the doctrine of the majority opinion, the statute and general charter powers of railroad companies are no longer a limitation upon the right to exercise the power of eminent domain, but are a general delegation of power, with such flexibilities that they will readily accommodate themselves to any situation if it can be shown that the proposed exercise is "required by the business of the company and the public needs." In this respect the majority opinion overrules the case of *Cairo, Vincennes and Chicago Railroad Co.* v. *Woodyard,* 226 Ill. 331. In that case the railroad company sought to condemn

239 — 15

land for the purpose of straightening its line of road, and urged in support of the right that the business of the company and the best interest of the public would be served by the proposed change in the location of the road. This court reviewed the authorities in this and other States, and announced the conclusion that the general rule which holds a railroad company bound by its original location was not subject to an exception in cases where the best interest of the company and the needs of the public would be served by a change of location. On this point I think the doctrine of the *Woodyard case* is well supported and that it ought not to be overruled. The *Woodyard case* is reported in 9 Ann. Cases, page 55, and in a note it is said that the *Woodyard case* follows the well settled general rule. If this is true, the majority opinion is a departure from the well settled general rule.

As a practical question, no railroad company would seek to condemn land unless in the judgment of its officers such land would be useful in its business and required by the public needs. Since under the majority opinion the existence or non-existence of the power no longer depends on the statute or charter, but "depends upon whether such depot site is required for its business and the public needs," all that it will be necessary in the future to set out in the petition to condemn, will be to aver that the company has a charter or is incorporated under the general Railroad act, and that the real estate proposed to be taken is "required for its business and the public needs." It will be noted that nowhere in the majority opinion is there any statement that the appellee has any special charter which goes beyond the general statutory powers granted to all railroad corporations, so that what is said in the majority opinion must be regarded as giving a new and heretofore unheard of construction to our general statute upon the subject. In a number of instances the majority opinion confuses the general discretionary powers of the railroad company in re-

spect to its original location with the incidental power which it has to enlarge its original facilities to meet the requirements of increased business. The majority opinion appears to be an exhaustive argument on the increased business of the Chicago and Northwestern Railroad Company and the public necessity which exists for re-locating its station, from which it is concluded that a great public necessity exists for the exercise of the power, and therefore the power exists. The legislature is the proper body in our system of government to determine when and under what circumstances it will grant the sovereign power of eminent domain, and it is to this body, in my opinion, that appellee should apply before it attempts to take the property of private citizens at a price to be fixed by others.

I think this judgment should be reversed because appellee has shown no power to condemn the land involved.

Mr. JUSTICE FARMER: I fully concur in the foregoing dissent of Mr. Justice VICKERS.