(No. 10939.)

THE CITY OF CHICAGO, Appellee, *vs.* JAMES F. LORD *et al.*—
(FREDERICK SCHOLER *et al.* Appellants.)

*Opinion filed December 21, 1916—Rehearing denied Feb. 8, 1917.*

1. EMINENT DOMAIN—*many circumstances must be considered in valuing property about to be condemned for public use.* In cases of condemnation of private property for public use the owner is entitled to compensation for the property actually taken and to damages, if any, to property not taken, and in valuing such property a variety of circumstances must be taken into consideration, including the situation of the property, as to its being leased or capable of being leased and bringing an income, or whether it is vacant and unimproved.

2. SAME—*what is the measure of damages in a condemnation proceeding.* The measure of damages for property actually taken by condemnation is its fair cash market value for its highest and best use, and as to property not taken is the difference between its value immediately before the filing of the petition and immediately after the completion of the improvement.

3. SAME—*what is a proper value when the testimony is conflicting.* In a proceeding to condemn city property for the widening of a street, where the evidence for the city and for the owners of the property is very conflicting, the owners are entitled to compensation for land taken in amounts somewhere between the valuations fixed by the witnesses for the respective parties.

4. SAME—*a view of the premises by the court in condemnation proceeding is a part of the evidence.* A view of the premises by the jury in a condemnation case, or by the court when the case is tried by the court without a jury, is in the nature of evidence, and the final award or compensation should be made upon a consideration of all the evidence, including the view and the testimony of witnesses.

5. SAME—*value of opinions of witnesses as to worth of real estate.* Where the valuation put upon the land by witnesses in a condemnation proceeding rests altogether in the opinions of such witnesses, their opinions are valuable only according to the extent to which they are backed up by the facts and circumstances shown by the evidence.

6. SAME—*what is a proper method of estimating value where real estate is under a long-term lease.* Where the real estate involved in a condemnation proceeding is under a long-term lease,

it is not improper to estimate the value of the property by considering the rent to be equivalent to an income of five per cent on the investment.

7. SAME—*when evidence of rent from neighboring property is not of much value.* Where land sought to be condemned for public use is subject to a long-term lease, evidence that other property in the vicinity rented for comparatively less is not of much value, as the question involved is not what the property could be rented for, but what it is actually rented for and worth to the owner.

8. SAME—*effect of clause in long-term lease `allowing lessee to cancel lease in case of condemnation.* Where property sought to be taken for widening a street is under a long-term lease giving the lessee the privilege to cancel the lease in case of condemnation proceedings by the city, the leases should be considered in estimating the value of the property taken without considering such clause.

APPEAL from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

JOHN L. McINERNEY, for appellants.

SAMUEL A. ETTELSON, Corporation Counsel, HARRY ATWOOD, EUGENE H. DUPEE, and TOLMAN, REDFIELD & SEXTON, (ROBERT REDFIELD, and HENRY P. CHANDLER, of counsel,) for appellee.

Mr. CHIEF JUSTICE CRAIG delivered the opinion of the court:

This appeal is by Frederick Scholer, Louisa J. Eberle and Ida C. Dutton from a judgment of the superior court of Cook county confirming an assessment of benefits and fixing the amount of compensation to be paid appellants for a strip of land sought to be taken by the city of Chicago for public use in a special assessment proceeding brought by the city pursuant to an ordinance enacted for the widening of West Twelfth street from Michigan avenue to Ashland avenue, in the city of Chicago. The court in the same proceeding fixed the amount of the assessment to be paid by the appellants herein as their proportionate share of the cost of the improvement, upon the ground that their prop-

276 — 35

erty would be benefited to the extent of such proportionate cost. No legal objections were interposed to the assessment.

The questions presented by the assignment of errors on the record are whether the amount awarded to appellants is "just compensation," whether the remainder of the land is benefited or damaged by the improvement, and whether the court erred in refusing to allow appellants to show the value of the reversion of the property, which was under long-time leases.

There is no controversy about the facts, except as to the proper valuation of the property taken, and the effect of such taking and of the widening of Twelfth street upon the property not taken.

By the petition, which was filed on April 7, 1911, the city of Chicago sought to condemn a strip of land 42 feet in width immediately south of the present south line of West Twelfth street, in said city, from Michigan avenue to Ashland avenue, for the purpose of widening said West Twelfth street 42 feet. The prayer of the petition was that commissioners be appointed to fix the compensation to be paid for land taken and damaged, and to fix the amount of public benefits and assessments against private property alleged to be specially benefited by the improvement.

Appellant Scholer was the owner of the following described property: Sub-lots 4 and 5 of lot 4, in block 68, in Canal Trustees' New Subdivision in the northwest quarter of section 21, township 39, north, range 14, east of the third principal meridian. This property will be hereinafter designated as "the Scholer property." Appellants Eberle and Dutton were the owners of sub-lot 3 of lot 4 in said block 68, and will hereinafter be designated as "the Eberle property." The Scholer property is at the southeast corner of the intersection of West Twelfth and Halsted streets, and has a frontage on West Twelfth street, on the south side thereof, of 49.7 feet, and a frontage on South Halsted street, on the east side thereof, of 90 feet, making a total

area of 4473 square feet: The Eberle property is immediately east of and adjoining the Scholer property, and has a frontage on West Twelfth street, on the south side thereof, of 25 feet and is 90 feet in depth, containing 2250 square feet. The Scholer property is improved with a two-story brick building. The ground floor is occupied by the West Side Trust and Savings Bank and is used for banking purposes, and the second floor is used for offices. The West Side Trust and Savings Bank is lessee of the Scholer property, and is also in possession of the Eberle property under a lease substantially identical in terms, with the exception of the amount of rent reserved therein. By this proceeding the petitioner seeks to condemn a strip of land 42 feet in width off the north side of the Scholer and Eberle properties. After taking said strip the Scholer property will have a frontage on Twelfth street of 49.7 feet and 48 feet on South Halsted street. The Eberle property will have a frontage of 25 feet on Twelfth street and will be 48 feet in depth.

The Scholer lease is dated the 30th day of December, 1909. It is for the full term of thirty years, from the first day of January, 1910, until the 31st day of December, 1939. The total rental to be paid during the term of the lease is $261,000. From January 1, 1910, to December 31, 1914, the rent is $650 per month; from January 1, 1915, to December 31, 1919, $700 per month; and from January 1, 1920, to December 31, 1939, $750 per month. All of such payments are payable in advance on the first day of each and every month. The lessee agrees to pay all water rates, taxes, assessments and special assessments, except for the widening of West Twelfth street. By the terms of the lease all buildings located on the premises revert to the lessor at the expiration of the lease. The lease contains an option of renewal for an additional period of twenty years. The rent for the first ten years of said period is fixed at $1000 per month and for the second ten years at $1125 per month.

The Eberle lease is dated November 1, 1910, and is for a term of twenty-seven years and eight months, from the first day of May, 1912, until the 31st day of December, 1939. The total rental to be paid during said period is $77,200, as follows: Beginning May 1, 1912, and ending December 31, 1916, the sum of $200 per month; beginning January 1, 1917, and ending December 31, 1926, $225 per month; and beginning January 1, 1927, and ending December 31, 1939, $250 per month, payable in advance on the first day of each and every month. The other terms of the lease are substantially identical with the Scholer lease. The Eberle lease also contains an option of renewal for a further period of twenty years at a rental of $300 per month.

The Scholer lease contained the following provision: "It is further understood and agreed that in the event any part of said premises is taken for public purposes during said term the lessee will have thirty days after judgment of condemnation to elect in writing and notify lessor whether or not it will cancel said lease, which right of cancellation is hereby given to said lessee. In the event lessee elects not to cancel said lease on said account and notifies said lessor as aforesaid, then the parties hereto will submit the question as to what extent the rental herein provided for shall be reduced on account of said taking to arbitration of three disinterested property owners, in the manner following: Each of the parties hereto shall select one arbitrator and notify the other party of such selection within thirty days after the expiration of the time limited for the lessee to cancel said lease as aforesaid. The two arbitrators so appointed shall, within ten days after their selection as aforesaid, appoint a third arbitrator, and the said three arbitrators shall forthwith proceed to determine and fix the fair monthly rental of that portion of the premises not taken by condemnation, which rental it is understood and agreed shall be less for each of the periods provided for herein than the

amounts herein fixed for each respective period, the rent so fixed by said arbitrators to take effect from the date of the execution of the judgment of condemnation."

The court fixed the compensation to be paid Scholer for land taken at $62,619 and confirmed an assessment of $9882.12, thus confirming the award and assessment fixed by the commissioners. It fixed the compensation to be paid for the Eberle property for land taken at $12,600 and improvements at $1800 and confirmed an assessment of $960. The award of the commissioners for the Eberle lot was $6300, for the improvements $1500, the assessment $960. The award for the improvements on the Scholer property, amounting to $31,800, by stipulation will be paid to the West Side Trust and Savings Bank, lessee. The same expert witnesses appeared and testified for both sides in the Scholer and Eberle cases. The matters were heard together and the same questions are presented for decision. It was stipulated on the trial that any evidence competent under any pleading might be introduced.

The first question to be determined in this case is, what is the proper compensation to be paid to appellants by reason of the taking of their property?—and this involves the proper method of ascertaining such compensation. In cases of condemnation of private property for public use a wide variety of circumstances must be taken into consideration, which would be different in every individual case. The owner of property is entitled to compensation for the property actually taken and of which such owner is deprived, and is also entitled to damages, if any, to property not taken. The measure of damages in condemnation is the fair cash market value of the property taken for its highest and best use, and the difference between the value of the remainder immediately before the filing of the petition and immediately after the completion of the improvement. (*St. Louis and Illinois Belt Railway* v. *Barnsback,* 234 Ill. 344; *Chicago, Santa Fe and California Railway Co.* v. *Ward,* 128 id.

349; *Freiberg* v. *South Side Elevated Railroad Co.* 221 id. 508; 2 Lewis on Eminent Domain, (34th ed.) sec. 706; *Peoria, Bloomington and Champaign Traction Co.* v. *Vance,* 225 Ill. 270.) In some cases but a small portion of the property will be taken, and that in such a way that the remainder of the property will be fully as valuable as it was before the taking. In other cases a portion of the property may be taken in such a way as to leave the portion not taken of no value, or of such little value that the condemnation will, in effect, amount to taking the whole. Between these extremes there might be an infinite variety of cases, each of which would depend upon the facts and circumstances of the particular case, and precedents, except those announcing general rules to be followed, would be of little value in arriving at what would be just compensation to be paid in such case. It is also manifest that much depends upon the situation of the property, as to its being leased or capable of being leased and bringing an income, or whether it is vacant, unimproved, etc.

The amount of compensation to be awarded, both for land taken and damages to the remainder, depending, as it does, upon values, is nearly always a question of fact, and in this case it is entirely a question of fact. As to the compensation for the land taken, witnesses for the appellants who were apparently familiar with real estate values and conditions in the locality of appellants' property valued the Scholer property at $3500 a front foot, or $39 a square foot, and gave as their opinion that the fair cash market value of the 42-foot strip to be taken, being 2087 square feet at $39 a square foot, was $81,200. There was some little difference in the ultimate values fixed by these witnesses, but they were substantially the amounts here given. They fixed the value of the entire Scholer lot, exclusive of buildings, at $174,000 on the same basis. These same witnesses valued the Eberle lot, 25 by 90 feet, at about $2250 a front foot, or $25 a square foot, total value $55,800, and

valued the part taken at $26,040. Witnesses on behalf of appellee who were real estate men of large experience in buying, selling, handling and appraising real estate in various portions of the city estimated the value of the Scholer lot at from $2250 to $2500 a front foot and from $25 to $27.50 a square foot. At $25 a square foot the fair cash market value of the portion taken is $52,500 and at $27.50 a square foot it would be $57,750. They fixed the value of the Eberle lot at $10 a square foot, or $22,500, and the value of the part taken at $10,500. On the evidence in the case appellants were entitled to compensation for land taken in amounts somewhere between the valuations fixed by the witnesses for the respective parties. The court allowed but little more than the value fixed by witnesses for appellee.

We are not unmindful of· the fact which appears in the record that the court personally viewed the premises and that the value fixed by the court from ·the evidence and such view is within the evidence. A view of the premises by the jury in condemnation cases, or by the court when the case is tried by the court without a jury, is in the nature of evidence, and the final award or compensation should be made upon a consideration of all the evidence, including the view and the testimony of witnesses. (*South Park Comrs. v. Ayer,* 237 Ill. 211.) The valuation fixed by witnesses for the respective· parties rests altogether in the opinions of such witnesses. These opinions of real estate values are only valuable according to the extent to which they are backed up by the facts and circumstances shown by the evidence surrounding the properties involved. Without reciting in detail the reasons given, in brief it appears that the testimony of the witnesses for appellants was based upon the value of said property for renting purposes. The leases made to the bank were taken into consideration, and the property was valued at what they considered it worth on an investment basis as producing five per cent in rents on

the amount they considered it worth. Witnesses for appellants also testified that this method was the usual and customary one in Chicago among real estate men in valuing fees in real estate subject to leases such as were in evidence in this case, and this is not disputed by the witnesses for appellee, and this was the method adopted and sanctioned by the court in *Chicago and Northwestern Railway Co.* v. *Mechanics' Institute,* 239 Ill. 197. Witnesses for appellee did not consider these leases in the same manner as witnesses for appellants, and the principal controversy in the case as to the compensation to be paid for land taken narrows down to the consideration which should be given to these leases as bearing upon the valuation of the property.

Counsel for appellee do not deny that these leases should be considered, but claim that the leases cannot be considered as extending for their full term because of the clause contained in the leases giving to the lessee the right to cancel said leases in case of condemnation, and also that the buildings erected on the premises by the lessee are not of sufficient value to be full security for the rent. The value of the Scholer property fixed by witnesses for appellants at $174,000 is based on the average rental of $8700 per annum, said average rental being five per cent of the value of the property. The leases in question, for all that appears from the record, have been made in good faith to a party that is entirely responsible and able and willing to pay and that will keep the property for the full term if not prevented by this condemnation and for a rental that is entirely fair and reasonable and in no way fictitious or uncertain. The corner in question is conceded by all the witnesses to be one of the best business locations in the city outside the loop district. There was evidence that the corner opposite to the Scholer lot and other property in the vicinity was rented for comparatively less. Such evidence is sometimes valuable, but the question in this case is not what the property in question could or might be rented for but what it actually

was rented for, and the corresponding cash value to the owner. Appellants are as sure of receiving the rent according to the provisions of the leases as anything can be sure in a business way. The lessee may fail or go out of business and cease to be a tenant of the property, but such contingencies are not to be surmised or inferred in the present condition of the record in this case. Nor do we regard the clause giving the tenant the right to cancel said leases in case of condemnation proceedings of any force. As far as appellants and the lessee are concerned the leases will extend for the full term and must be considered on that basis. If the condemnation proceedings had never been commenced appellants would have received rents for the full term as provided in the leases. The condemnation suit was something that might or might not have happened. It was no fault of either the lessors or lessee that it did happen. If the leases in question had contained a clause providing for a right of cancellation in the event of the happening of some other contingency such clause would have to be taken into consideration in determining the value of the leases, and if such contingency had happened or circumstances were such that it might happen such circumstances could be shown, but we think appellants are entitled to have the leases considered in this case without taking into consideration the clause giving the lessee the right to cancel the same in case of condemnation. Accordingly we think that the opinions of witnesses for appellants and other witnesses who base their opinions on the same state of facts are more worthy of consideration and such evidence is of greater weight, and in determining the value of the property taken the leases should be considered under the circumstances of this case, without taking into consideration the clause allowing the lessee to cancel said leases in case of condemnation.

As to the damages to the portions of the respective properties that were not taken, all the witnesses, in fixing the valuation of the properties as they now are, estimated the

value per square foot with no difference in the values of respective portions of each property, taking it as a whole. The witnesses for appellants testified that the portions remaining after taking the 42-foot strip would not be worth as much per square foot as the original lot. Witnesses for appellee testified that the remainder would be worth more per square foot by reason of the improvement. There was a great deal of evidence on this subject and the witnesses were examined and cross-examined at length. Nearly every piece of property along the south side of Twelfth street between Michigan and Ashland avenues was mentioned and the dimensions and use to which such properties were put described. There are many lots of less depth than those of appellants which have buildings thereon and are used and rented. It is not necessary to go into this evidence in detail. In this case a portion amounting to nearly half of each lot is to be taken. If the remainder is worth as much in proportion,—that is, as much per square foot,—after the taking as before, then it has not been damaged by reason of the taking and the owners have been fully compensated when they have been paid for the land actually taken; if it is worth less than it was before as a part of the original lot then it has been damaged. The measure of damages to land not taken in condemnation for railroad purposes is the difference in the fair cash market value of the land before and after the construction of the railroad, (*Peoria, Bloomington and Champaign Traction Co.* v. *Vance, supra,*) and the measure of damages in this case is the difference in the fair cash market value of the part not taken before and after the taking. After a full consideration of all the evidence on this point we are not prepared to say that the trial court erred in not allowing damages for the land not taken. The same is true as to the question of benefits. There was ample evidence that the property remaining would be benefited by the widening of the street and the construction of a new bridge and viaduct to take the place of those now in

the street, and there were reasons given why such benefits would accrue. We cannot say that the court erred in confirming the assessment for benefits.

It is also contended that the court erred in excluding evidence as to the value of appellants' reversion in the premises after the expiration of the leases, and the case of *Corrigan* v. *City of Chicago,* 144 Ill. 537, is cited in support of this contention. It was held in that case, in apportioning an award for premises under lease which were condemned in widening a street, that the interest of the lessor was the value of his reversion and the rents, but the question involved was the apportionment of an award in condemnation between the lessee and the lessor. As we have already stated, the rule is that where property is taken in condemnation proceedings the owner is entitled to the fair cash market value of the property taken, and there are many conditions which it might be necessary to take into consideration in arriving at such fair cash market value. Another way of stating the proposition is, that the owner is entitled to damages in such an amount as will make him whole, or is entitled to such sum as under all the circumstances is a fair and full equivalent for the property taken. Where the property is under lease, as in the case at bar, this element is to be considered and the amount that will be derived from the lease is to be taken into consideration, but it is entirely clear that whether the compensation is awarded on the basis of rents that will be lost by reason of the condemnation and the value of the reversion afterwards, or if such sum is fixed as under all the circumstances will reimburse the property owner for the loss of his property and loss of rents, in either case the owner would receive what would be just compensation, so if the award is made giving full consideration to the lease in the property and according to the method hereinbefore indicated such evidence would be immaterial.

For the reasons given, the judgment of the superior court will be reversed and the cause remanded to that court for further proceedings in conformity with the views herein expressed.

*Reversed and remanded.*