Chief Judge Fuld.
In each of these three condemnation proceedings, we are called primarily upon to decide the method to be employed in computing a claimant’s damages where there has been a partial taking of cemetery lands. Since this question of law is applicable to all three appeals, it may be helpful to discuss it before undertaking a more detailed consideration of each of the several appeals themselves.
It is settled that, as a general proposition, the measure of damages in partial taking cases is the difference between the value of the whole before the taking and the value of the remainder after the taking. (See Matter of City of New York [Fourth Ave.], 255 N. Y. 25; see, also, 1 Orgel, Valuation Under Eminent Domain [2d ed.], § 64, p. 290 et seq.) Consequently, the decision on each of these appeals turns on whether that rule should have been applied in these cemetery cases.
Our decision in St. Agnes Cemetery v. State of New York (3 N Y 2d 37) pointed the method of valuing cemetery lands in condemnation proceedings. (See, also, Diocese of Buffalo v. State of New York, 18 N Y 2d 41; Mount Hope Cemetery Assn. v. State of New York, 10 N Y 2d 752.) After first observing that these lands were to be appraised on the basis of their value for their highest and best use —in that case, for continued cemetery use — the court went on to hold that such value is to be ascertained by first arriving at a probable sale price of the land as cemetery plots or graves, based on the ‘ ‘ average ’ ’ price which the cemetery obtained for the sale of burial plots located in adjoining sections (3 N Y 2d, at p. 40). After the cost of making such future sales is deducted, an estimate is made of the number of years it would take to sell off all the plots in the cemetery as it existed prior to the condemnation. The amount of net income expected annually over the projected number of years is treated as if it were an annuity whose present value, determined by reference to annuity tables, is regarded as the fair market value of the cemetery’s undeveloped grave sites. In other words, the *324 value of the land is equivalent to the present worth of future net income to he derived from the steady sale of a continuously diminishing inventory of cemetery plots, year by year, until the supply of land is depleted.
On the appeals before us, the claimants as well as the State accept the formula adopted in St. Agnes as the method to be followed in determining the valuation of a cemetery. More, the State acknowledges that the courts below correctly applied that formula to find the value of the entire area of unsold plots or graves before the taking. However, contends the State, the courts below erred in failing to use the formula in order to ascertain the value of the property retained by the claimants after such taking; indeed, they made no attempt whatsoever to find that vitally significant figure, the value of the land retained after the taking. Instead of employing the “ before and after ” measure of damages rule, the trial court averaged the value of all the unsold graves before the taking — according to the St. Agnes formula — and, then, simply multiplied the average unit plot value by the number of unsold plots which had been taken in condemnation.
The departure from the 11 before and after ’ ’ rule resulted in error. The court’s decision in the St. Agnes case was premised on the dual assumption that cemetery land is valuable as an inventory of individual grave sites which may properly be treated as fungible and that sales will continue at a constant rate until they are all sold. On this premise, any particular undeveloped cemetery plot could be substituted for any other, and the only direct effect of a partial taking is to reduce the economic life of a cemetery. In other words, since the sales will presumably continue at the same rate, the condemnation taking will merely decrease the period of time during which the supply will be available. This economic assumption — that the only effect of a partial taking is to reduce the economic life of the cemetery — underlies the ‘1 before and after ’ ’ approach urged by the State, a contention which relates to the measure of damages in these cases. This particular question, critical to decision herein, was not raised by the parties nor considered by the court in St. Agnes. In that case and in the others which followed it, we were concerned only with the method of valuation, not with the measure of damages.
*325 No reason exists for not applying the “before and after” rule in cases involving a partial taking of cemetery lands. What the owner has lost is, after all, the ultimate measure of damages. (See, e.g., Rose v. State of New York, 24 N Y 2d 80, 87; St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 41, supra; Boston Chamber of Commerce v. Boston, 217 U. S. 189, 195.) In the main, uncomplicated by any claim or issue of consequential damages or benefits to the retained property (but see discussion in Buffalo Park case, infra, pp. 328-329), the only effect of the taking has been to reduce the size of each cemetery, just as would a street widening, if the cemeteries had fronted on city streets. The remaining property still retains its essential characteristics after the taking, is still just as useful for cemetery purposes, as it was before the taking.
This being so, there is no reason why the St. Agnes method of valuation should not be used to determine the value of the retained land after the taking in precisely the same way as it was used by the courts below to determine the value of the entire cemetery before the taking. Indeed, our decision in Matter of City of New York (Fourth Ave.) (255 N. Y. 25, supra) furnishes strong authority for this conclusion. In that case, the claimant owned an entire square block (then undeveloped) in Manhattan, from Park (Fourth) to Lexington Avenue and from 32nd to 33rd Streets. The city took a 20-foot strip along the entire Park Avenue frontage for a widening of that thoroughfare. The court rejected the claimant’s contention — very similar to that made by the cemeteries on these appeals — that it should look solely to the land taken (the Park Avenue frontage), viewed as an independent parcel, as the measure of the award to be made. Instead, it recognized that, in reality, the claimant still had a square block fronting on Park Avenue and that it was damaged only to the extent that the block was 20 feet shorter from east to west.
Just as in the Fourth Avenue case, so in the cases before us, we can only make our determination on the basis of a realistic view of what the claimant lost, and that was to be measured by valuing the property retained by the claimant after the taking. In the Diocese of Buffalo case, for example, the only effect of the taking was to reduce that claimant’s supply of unsold graves from 65,450 to 61,950. So visualized and regarded, the measure *326 of damages should be, to quote from our opinion in the Fourth Avenue ease (255 N. Y. 25, 29, supra), “ the difference between the fair market value of the whole before the taking and the fair market value of what remains.”
There is, of course, a difference between the methods of valuation in a cemetery case and a case such as Fourth Avenue. Cemetery land is to be valued — St. Agnes teaches—by reference to a projected annual net income from sales over a period of years while in the other case the land is to be appraised by using the more common method of estimating square foot or unit lot values by reference to sales of neighboring and similar property. The distinction should not, however, affect the conclusion that the damages are to be measured by considering the impact of the appropriation on the property retained by the claimant. Since, as already indicated, the only effect of a partial taking of a cemetery is to shorten its economic life, a claimant — to borrow the figures from the Diocese of Buffalo case-—who sells 1,190 graves a year and who has lost 3,500 grave sites is in the same economic situation as a person left with an annuity smaller by three years.
A leading manual, dealing with partial taking cases, describes the ‘ ‘ before and after ’ ’ method as ‘ ‘ decidedly the best one in all cases ”. (McMichael’s Appraising Manual [4th ed.], pp. 442-443.) The author emphasizes —-what is, indeed, self-evident where the highest and best use of the property has not been affected by the taking—-that the “ before and after” method “involves two calculations” and that both calculations (i.e., appraisals) must be made by identical methods. The courts below, having used the St. Agnes formula to determine the ‘ ‘ before ’ ’ values, should likewise have made 1 ‘ after ’ ’ value determinations and, of course, in doing so, would have been required to employ the same method. Their failure to do so resulted in error, the extent of which will become evident when we approximate the findings which would result from application of the correct rule in each of the cases to which we now turn and compare them with the findings actually made.
Diocese of Buffalo v. State
In this case, the Court of Claims found that it would have taken 55 years to sell off the grave sites as the cemetery stood *327 before the taking. The claimant owned 65,450 grave sites which would have been sold at the rate of 1,190 a year. And, since the parcel taken involved 3,500 graves, the effect of the appropriation was simply to reduce the life of the annuity by three years, the length of time during which they would have been sold. The court found the “ before ” value — i.e., the value of the income from the sale of 1,190 plots a year over a 55-year period—to be $1,870,462.33 but made no finding as to the “ after ” value — i.e., the value of the income from the annual"sale of those 1,190 plots over a period of 52 years — and there must, therefore, be a new trial.[1]
The court made an award of $100,030'; it arrived at this figure by (1) taking the “before” value of the entire property — $1,870,462 for the 65,450 graves —• (2) finding the average value of each grave to be $28.58 and, then, (3) multiplying that figure by the total number of graves appropriated, 3,500. Quite obviously, if, as the State maintains, the value of the property retained after the appropriation is $1,855,354.77 (see n. 1, supra), an award of $100,030 for the land taken would leave the claimant with property worth their combined sum — $1,955,384—an amount far in excess of $1,870,462 which the trial court found to be the value of its property before the taking. Simply put, the ‘ ‘ averaging ’ ’ procedure adopted below resulted in a windfall to the claimant.
There was a flaw in the reasoning of the courts below which led to such a result. The present value of a grave site depends, to a great extent, on the time when it will be sold. Thus, in this particular case, plots which were to be sold immediately were found to be worth over $130 each, while those which would not yield any income for 55 years were only worth about $5. The figure used by the Court of Claims — $28.58 per grave — represented an “ average value ” which would apply only to those graves sold toward the middle of the cemetery’s life. However, as we have already stated, the claimant’s sales will presumably continue at an undiminished rate of 1,190 a year throughout its *328 life, in consequence of which the claimant will experience no loss until 52 years have elapsed and it is forced to terminate its sales three years earlier than had there been no condemnation. It is only the value of the sales lost during the period at the very end of the cemetery’s existence, rather than an “ average ” figure, which properly reflects the damage resulting from the taking.
Before bringing our discussion of the Diocese of Buffalo case to a conclusion, it is necessary to treat another issue, one raised by the claimant as cross appellant — namely, that the 6% discount rate employed in arriving at the present value of the annuity calculations was too high. We need but observe that, since this determination is based upon factual considerations, relating to “ prudent ” investments, which have support in the evidence, it is conclusive upon us, beyond the scope of our review.
Buffalo Burial Park Association v. State
The claimant in this case lost, as a result of the State’s appropriation, some 30,405 out of a total of 82,907 available grave sites. In fixing its award for the taking, the Court of Claims made no attempt to find the value of the 52,502 plots which remained in the claimant’s possession after the taking. Instead, it adopted the same methodology employed in the Diocese of Buffalo case. It found the present value of the entire parcel before the taking ($817,895.70)—-by means of the St. Agnes method-—and reduced it to an “ average” value per grave ($9,865). This “ averaging ” procedure, having no relation to the actual loss suffered by the claimant, resulted in a valuation of the graves taken at $299,945, and the award was based on this figure.[2]
If the court had used the St. Agnes method, employed to find the ‘£ before ’ ’ value of the parcel, to ascertain the present worth of the 52,502 plots which the cemetery retained after the taking, it would, according to the figures provided by the State, have found that the cemetery still had grave sites worth $797,835.99. *329 If this is added to the $11,770 found to be the value of land still retained by the claimant but no longer available for cemetery use (see n. 2, supra), the value of the claimant’s holdings after the taking would be $809,605.99. This, then, would indicate that the entire loss suffered by the claimant as a result of the appropriation of its grave sites was no more than $8,289.71.[3]
However, it may be that the actual loss suffered by this claimant should not be measured by the St. Agnes formula. That formula is based upon the assumption that highest value of the land is for subdivision and future sale as cemetery plots but, when a parcel is extremely large, in relation to its annual rate of sale, that assumption no longer holds true. The reason for this may be seen from the present case where, prior to the taking, the cemetery owned so much land that, if it continued its annual sales rate of 1,081 graves a year, some of its property would yield no income for 88 years. The present value of income so long deferred is small indeed and the owner would be better off, economically, if it were to apply a portion of its land to other uses. The State, recognizing this, suggests — and we believe fairly and correctly — that the land should be appraised for noncemetery purposes. According to the State’s own computations, the result of such an appraisal would be to fix the value of the land before the taking at $883,500 rather than the $817,895 derived from use of the St. Agnes formula. This higher ‘1 before ’ ’ value would, of course, result in a substantial increase to the claimant’s award. Indeed, even according to the State’s own computations, the claimant would be entitled to compensation — exclusive of special damages — of at least $127,770.3 [4]
In addition to other damages, it is our view that Buffalo Park is also entitled to compensation for the loss of 5,000 pine trees which it had planted for nursery purposes in 1954 in an undeveloped section of its cemetery. Such an allowance would not result in any inconsistency since the use of the land for nursery purposes did not affect its value either for cemetery purposes *330 or any other nse. The nursery was to serve only a temporary function. The trees, set out in regular nursery farm rows, were to he transplanted to various other points in the cemetery from time to time, as needed, and, as they were removed, the land on which they had stood would be as valuable for grave sites or, indeed, for any other use as it would have been if the trees were never planted. Nor would an allowance for these trees result in any duplication of damages, since the nursery trees, unlike the trees already planted in the cemetery proper, were not included by any of the witnesses in the computation of the value of the land appropriated. Since- ascribing a separate value to the nursery trees would involve neither duplication of awards nor improper aggregation of inconsistent values, the parties may, on the retrial, introduce evidence of value of those destroyed by the taking as an additional item of damage.
St. Stanislaus Roman Catholic Church Society v. State
The Court of Claims adopted the same methodology in this case as it employed in the two already discussed. Although it correctly applied the St. Agnes formula in valuing the entire parcel before the taking, it failed to ascertain the worth of the land retained by the claimant after the appropriation. As we have already noted, the method followed by the court — multiplying the number of graves lost by the “ average value ” per grave—..does not reflect, realistically, the actual loss to the claimant resulting from the condemnation.[5]
The State does not challenge the additional amounts awarded for the items of shrubbery and a new road totaling $38,500. It does, however, take issue with the further award of $20,097 for temporary easements, taken by the State to provide work areas for the exhumation of human remains, general work areas and detours. The State’s own appraiser, however, made an allowance for this item of damage and, in our judgment, it was prop *331 erly included by the courts below.
In sum, then, there must be a reversal and a new trial in each of these cases. The Court of Claims failed to consider the value of the land which remained in the ownership of the claimant after the taking and, in so doing, rendered awards which were far in excess of the claimants’ actual loss. Upon the new trials, it will be incumbent on the court to make awards solely on the basis of the difference between the value of the claimants ’ property before and after the taking plus such special damages as may be shown to be appropriate in the individual case.
The order appealed from in each case should be reversed, and the matter remanded to the Court of Claims for further proceedings in accordance with this opinion.

. According to the State, reliance cn the same actuarial tables used to obtain the “ before ” value would have yielded an “ after ” value of $1,855,354.77. The State argues that the difference between those figures—$15,107.56 — would represent the damages to the claimant. It will be for the trial court to take evidence on this issue and determine the exact amount of the claimant’s damages.

. A portion of the grave sites lost by the claimant were on land which was not actually appropriated but which was severed from the main parcel and thereby rendered unsuitable for cemetery use. The residual value of this land ($11,770) was subtracted from the court’s estimate of the claimant’s lose. Another item of damage — $7,500 for the preparation of a new development plan—'Was then added, bringing the final award to $295,675.

. Adding the $7,500 item of special damages (see n. 2, supra) would raise the amount of damage to $15,789.71.

. The other two claimants are, of course, also privileged on the new trials to establish, if they can, a higher and better use for their land than for cemetery purposes.

. The Court of Claims made an award of $495,072 as direct damages for the loss of the grave sites. When one .compares the value of the land before the taking ($2,321,751.34) as found by the courts below with the value obtained by applying the same method to the land retained by the claimant after the taking, an “ after ” value, asserted by the State to be $2,147,818.25, it appears that the actual damage suffered would be only $173,933.09, a figure far below the award rendered.