THE DEPARTMENT OF TRANSPORTATION, Petitioner-Appellee, *v.*
REGINA E. BOUY *et al.*, Defendants.—(DECATUR CEMETERY LAND
COMPANY *et al.*, Defendants-Appellants.)

Fourth District   No. 15014

Opinion filed March 8, 1979.

30

Monroe, Wilson, Dyar, Houchen, McDonald & Taylor, of Decatur, for appellants.

William J. Scott, Attorney General, of Springfield (Stephen O. Willoughby, Special Assistant Attorney General, of counsel), for appellee.

Mr. PRESIDING JUSTICE REARDON delivered the opinion of the court:

This appeal involves an award of damages for a portion of defendants' cemetery land, appropriated for highway purposes, by the Department of Transportation of the State of Illinois. Defendants requested compensation for (1) the .803 acre of property taken for the roadway; (2) the .671 acre taken for a temporary easement during the period of construction; and (3) damages for injury caused to the remainder. The jury found the value of the property taken to be $72,700 and the value of the temporary easement to be $2,300. No award was made for the alleged damage to the remainder.

Defendants challenge the judgment contending essentially that the trial court improperly precluded admission of defendants' expert opinion testimony showing the value of the property taken was $228,854 and the damage to the remainder $43,447. The primary issue, on appeal, is whether this expert opinion evidence was properly excluded as a matter of law.

The cemetery, at the time of taking, was 58 years old and consisted of 95 acres. The parties stipulated that the highest and best use of the land is a cemetery and that this use is a special use.

At the trial, petitioner's witness, James Lloyd Brown, an appraiser, testified that he primarily used the "income approach" in appraising defendants' property. This method of appraisal is based on the income, expenses, and the profit that could be anticipated from the operation of the cemetery. In applying this formula, Brown first determined the cemetery's net yearly income ($79,000). He then calculated the estimated economic life of the cemetery (59 years) by multiplying the average number of graves sold per year, since the cemetery's existence, times the remaining available grave sites. Brown then determined the *present* value of the income to be received from the remaining available grave sites ($787,156) by multiplying the net yearly income by an "Inwood Coefficient" (a table measuring the *present* value of income to be received in the future) of 9.64. This multiple or coefficient was derived by measuring a capitalization rate of 10% (a figure representing the appraiser's estimate of the anticipated rate of return from the property's income) over the economic life of the cemetery.

Brown then divided the $787,156 figure (the product of the net yearly income and the Inwood Coefficient) by the remaining acres available for grave sites. The present value per acre ($19,679) was then multiplied by the .803 acre taken, producing a figure of $15,800 as the value of the property taken. Using a similar procedure he determined the value of the temporary easement to be $3,300. In addition, Brown testified that the

valuation of the property taken should include the value of shrubs, trees, and other improvements which were destroyed. He concluded that the total value of the taking was $54,300.

The petitioner's other expert witness, Harry R. Arneson, testified that he also used the income approach in appraising the property. Arneson concluded that the value of the property permanently taken was $74,772 and the value of the temporary easement was $2,300. He used substantially the same procedure as Brown in applying the income method, although in his calculations, he had estimated the cemetery's net income to be $160,591 and its remaining economic life, prior to the taking, at 54 years. He also used a 12% capitalization rate, instead of the 10% employed by Brown, in arriving at an Inwood Coefficient of 8.31. This factor multiplied by the net income produced Arneson's estimate of the value of the available grave sites before the taking ($1,335,149). He then determined the net income figure per grave site to determine the value of the grave spaces actually taken. As had Brown, Arneson also included in his valuation an estimated value of the improvements which were destroyed. Both Brown and Arneson concluded that there was no damage to the remainder as a result of the taking. On cross-examination, Arneson stated that, in using the income approach, it would be inappropriate and speculative for an appraiser to use a different capitalization rate to measure the value of the property after the taking than was used to measure the value of the property before taking.

Donald Ward, a landscape and cemetery planner, testified for defendants. He stated that there had been a loss of aesthetics as a result of the taking. A substantial number of trees, shrubs, and other plantings, together with the brick main entrance had been destroyed. In his opinion, the frontal area, including the trees and plants, were the "showcase" of the cemetery. He estimated that, because these plants and trees could not be replaced by full size substitutes, it would be years before the cemetery would return to the same condition it was in prior to the condemnation.

Defendants' expert witness, William C. Henning, testified that he also used the income approach in making his appraisal. His method of valuation did not substantially differ from the approach used by petitioner's experts. Henning, however, determined the value of the cemetery before taking and then measured the value after the taking using a different capitalization rate for each calculation. He measured the damages to the property by taking the difference between the before-taking and after-taking figures.

Henning testified that, because different economic considerations would affect the choice of an appropriate capitalization rate, depending upon the nature of the taking, he selected different capitalization rates for

determination of the value before taking and the value after taking. He noted that after the taking, due to the removal of plants and the effects of construction, the area became less desirable. The petitioner objected to this testimony on the grounds that those factors were not compensable and the evidence was being used to justify changing the capitalization rate.

Following this objection, the court, without objection from the parties, examined Henning out of the jury's presence. The court questioned Henning with respect to the so-called *St. Agnes* formula for measuring the value of a partial taking of cemetery property. (See *St. Agnes Cemetery v. State* (1957), 3 N.Y.2d 37, 163 N.Y.S.2d 655, 143 N.E.2d 377.) Henning noted that he was familiar with the *St. Agnes* case but that he was unfamiliar with the particular capitalization rate used there in measuring the value of the property before and after the taking. The court asked the witness, "Would you agree that the only effect upon that partial taking is to reduce the economic life of the cemetery?" Henning responded that he disagreed with that statement. He explained that in his opinion the condemnation would cause various factors, relevant to the capitalization rate, to change, thereby, necessitating the application of a different capitalization rate to derive the appropriate Inwood Coefficient.

After this inquiry, petitioner's initial objection to Henning's testimony was sustained. When direct examination of the witness resumed, he again attempted to explain why he felt the capitalization rate would change. Objections to this testimony were sustained. Following arguments by counsel, defendants made an offer of proof as to Henning's testimony.

Henning testified that, in appraising the property, he had used a capitalization rate of 10% before the taking and a 12% rate after the taking. He repeated that his justification for doing so was that, in his opinion, the factors involved in determining the capitalization rate would change when measuring the value of the property retained after the taking.

According to Henning, in arriving at a capitalization rate, an appraiser takes into consideration three factors: (1) the degree of risk in sales; (2) the liquidity or nonliquidity of the cemetery; and (3) an evaluation of prevailing interest rates and those likely to prevail over the expected economic life of the cemetery.

Henning stated that the degree of risk factor is directly related to the stability of sales. In his opinion, the taking would affect sales stability because of the loss of numerous mature plantings along the front of the cemetery. The lack of these plantings would make the cemetery less attractive and less desirable, affecting both the "immediate need" and "pre-need sales." Because of what he termed "heritage sales" (the

proclivity of family members to be buried in the same cemetery) the decrease of present sales would have a long-term effect on sales throughout the life of the cemetery.

Henning also concluded that the condemnation would adversely affect the liquidity of the cemetery and the available interest rates. These effects were also attributable, in part, to the anticipated decrease in sales. The combination of these adverse effects would warrant a corresponding increase in the capitalization rate chosen to measure the after-taking value of the property.

Using a 10% capitalization rate to measure the value of the property before taking and a 12% rate to measure the value of the property retained, Henning determined that the value of the land taken was $228,854. In addition, during the offer of proof, he concluded that the condemnation had caused damage to the remainder of the property in the amount of $43,447. The trial court refused defendants' offer of proof.

Defendants' primary contention on appeal is that the court erred in excluding Henning's testimony as a matter of law. They maintain that the criteria used by an expert in reaching his opinion merely affects the weight of his testimony not its competency. *Department of Public Works & Buildings v. Finks* (1956), 10 Ill. 2d 15, 139 N.E.2d 267.

Before specifically addressing this issue, we digress for a time to give further consideration to the approach of valuation relied on by the parties. It appears that no Illinois case has dealt precisely with the measure of valuation to be adopted with respect to the partial taking of cemetery property. Some jurisdictions have adopted the so-called "income approach," while others have rejected it. (See generally Annot., 42 A.L.R.3d 1314 (1972); Nichols, The Law of Eminent Domain §12.32(4)(a) (3d ed. 1973) (hereinafter cited as "Nichols").) The cases which have adopted the income approach are premised on the notion that there are types of property which do not have a reasonable market value, as that concept is normally applied, because the property is not bought and sold on the open market. Thus, the evidence of fair market value, in the traditional sense, is not obtainable and resort to some other formula or method of valuation is required. (*State ex rel. State Highway Com. v. Barbeau* (Mo. 1965), 397 S.W.2d 561.) In dicta, it has been held in Illinois that there are a few exceptional cases in which market value cannot be the legal standard of compensation, because the property is applied to such special use, such as a cemetery, that it cannot have a market value. (See *City of Chicago v. Farwell* (1918), 286 Ill. 415, 121 N.E. 795 (dicta); *cf. County of Cook v. City of Chicago* (1967), 84 Ill. App. 2d 301, 228 N.E.2d 183 (condemned school property should not be valued on market value basis).) More recently, however, the supreme court has reinterated the principle that "market value" is the proper

measure of just compensation and that deviation from that standard should occur "only when property has special capabilities which make it unmarketable at its true value due to unique improvements * * *." (*People ex rel. Director of Finance v. YWCA* ((Docket No. 50661, filed Jan. 26, 1979), ___ Ill. 2d ___, ___, ___ N.E.2d ___, ___.) The parties here stipulated that defendants' cemetery was a special use. We have found no cases in Illinois holding, other than by dicta, that a cemetery constitutes special use property. *E.g., Farwell.*

■■■ Nevertheless, without expressing a view as to the propriety of the parties' characterization or classification of the property, we believe that their employment of the income approach was a reliable method for determining value. In holding that YWCA facilities did not constitute a special use, the supreme court, in its most recent opinion, specifically stated that it was not addressing the question of the applicability or propriety of other valuation methods. The court emphasized that various *methods of valuation* may be appropriate if warranted by the proper circumstances. (See, *e.g., City of Chicago v. Lord* (1916), 276 Ill. 544, 115 N.E. 8 (consideration of rental income from property subject to long term lease proper); compare with *Department of Transportation v. Quincy Coach House, Inc.* (1976), 64 Ill. 2d 350, 356 N.E.2d 13 (projected rental income too speculative with respect to owner occupied premises).) From our examination of the decisions in other jurisdictions we conclude that the circumstances of a partial taking of cemetery property justifies the parties' resort to the income method of valuation. See Annot., 42 A.L.R.3d 1314 (1972).

As partially set out in the previous discussion, the income approach, although variously applied, is a method of determining the present value of future earnings to be derived directly from the property. At the risk of oversimplification, it essentially consists of, first, determining the value of the burial sites or the net income therefrom. This figure is achieved by calculating the average annual gross income (multiplying gross price per lot by sales per year) and subtracting the average annual expense (including cost of development, sales, maintenance, administration, etc.). This net annual income is then converted into the *present value* of the future income by calculating the discount for the deferred realization of the income over the selling period of the remaining grave sites. Essentially the Inwood multiple or coefficient is the factor or means used to discount this future income. Apparently there is some disagreement among the authorities and the cases as to precisely how the measure of the present value of the cemetery before taking is applied to arrive at the value of the property actually taken. *E.g., Barbeau; Diocese of Buffalo v. State* (1969), 24 N.Y.2d 320, 300 N.Y.S.2d 328, 248 N.E.2d 155; see also Nichols, The Law of Eminent Domain §12.32(4)(a), at 12—599—600 (3d ed. 1973).

Defendants' expert, Henning, followed basically the approach suggested by *Diocese of Buffalo* of determining the value of the cemetery before the taking and determining the value after the taking based on the amount of grave sites retained. The difference between these two figures, as stated above, provides the measure of damages for the property taken.

Having departed somewhat from the focus of this appeal, we return to the essential question before us. Does the income approach, which was employed by Henning, require that the same capitalization rate be used to determine the value of the cemetery property after the taking as was used to determine the value before taking? Defendants contend that nothing in the *St. Agnes* or income formula, or in the *Diocese of Buffalo* opinion, demands the use of an identical capitalization rate for the *before*- and *after*-taking measurements.

■■ The petitioners correctly argue that it was held in *Diocese of Buffalo* that:

"[T]here is no reason why the *St. Agnes* method of valuation should not be used to determine the value of the retained land *after* the taking in precisely the same way as it was used * * * to determine the value of the entire cemetery *before* the taking." (24 N.Y.2d 320, 325, 300 N.Y.S.2d 328, 331-32, 248 N.E.2d 155, 157.)

However, the divergence from the "before and after" measure which the court found was erroneous did not relate to a change in capitalization rates.

Defendants strongly rely on the principle that the discount or capitalization rate employed in the income approach is related to factual considerations which are essentially beyond the scope of review. (See *Diocese of Buffalo*, 24 N.Y.2d 320, 300 N.Y.S.2d 328, 248 N.E.2d 155, 159; *St. Agnes*; see also *State ex rel. State Highway Com. v. Mount Moriah Cemetery Association* (Mo. 1968), 434 S.W.2d 470.) Defendants conclude from this that Henning's testimony, with respect to why a different capitalization rate should be adopted for the after-taking valuation, should have been allowed into evidence.

■■ Although we agree that the discount or capitalization rate involves essentially questions of fact, we are, nevertheless, unwilling to accept the assertion that a different capitalization rate can be applied in measuring the "before and after" value of the property. As was stated in *Diocese of Buffalo*, the use of the *St. Agnes* method of valuation, uncomplicated by a question of consequential damages, is premised on two basic economic assumptions: (1) That cemetery land is valuable as an inventory of individual grave sites which may be treated as fungible; and (2) That sales will continue at a constant rate until they are all sold. Concerning the second assumption, the New York court elaborated:

"[T]he only direct effect of a partial taking is to reduce the economic life of the cemetery* * *. * * * [S]*ince the sales will presumably continue at the same rate, the condemnation taking will merely decrease the period of time during which the supply will be available.* This economic assumption—that the only effect of a partial taking is to reduce the economic life of the cemetery— underlies the 'before and after' approach [of *St. Agnes*] * * *." (Emphasis added.) 24 N.Y.2d 320, 324, 300 N.Y.S.2d 328, 331, 248 N.E.2d 155, 157.

The expert testimony of defendants' witness completely deviates from those economic assumptions inherent to the income method. Henning's theory for changing the capitalization rate was tied directly to the assumption that the condemnation would produce economic consequences beyond merely reducing the economic life of the cemetery (*i.e.*, reducing the number of graves which could have ultimately been sold). Contrary to the presumption articulated in *Diocese of Buffalo* (that sales would continue at a steady rate based on the average sales per year over the previous life of the cemetery) Henning maintained that one must presume that, as a result of the taking, sales would decrease. From this decrease in sales there would follow the consequences of increased risk, decreased liquidity, and adverse interest rates, which would justify changing the capitalization rate for measuring value after the taking.

■ We conclude that the witness' basis for changing the capitalization rate would render the income method of valuation speculative and conjectural. From our examination of the cases and authorities we have found no instance where different before and after capitalization rates were employed to determine the value of the taking. See Nichols; E. J. Friedman, Encyclopedia of Real Estate Appraising (3d ed. 1978); Highway Research Board Report 92, at 25-35 (1970).

■■ As the court stated in *St. Agnes,* the income valuation is based on clearly to-be-expected future earnings. The court, in adopting the income approach, relied on the fact that "[t]he circumstances of an established cemetery are less subject to change than business enterprises, and offer a safe guide to value." (3 N.Y.2d 37, 45, 163 N.Y.S.2d 655, 663, 143 N.E.2d 377, 382.) The court further reasoned:

"Because of the inevitability of death, the demonstrated experience of the cemetery * * *, the future of this cemetery is *not* subject to variable business factors or dependent upon the exercise of business judgment attending the operation of [other business enterprises] * * *." 3 N.Y.2d 37, 45-46, 163 N.Y.S.2d 655, 663, 143 N.E.2d 377, 382-83.

■■ ■ We conclude that those assumptions are equally applicable, or should be, to the present case. The utility of the income approach, as an

alternative method of measuring value, lies in the stability and certainty inherent in those assumptions. The presumption of stability allows the appraiser to project with reasonable certainty the productiveness and capability of the land for yielding income in the future. This anticipated productive capability (properly discounted) has bearing on the present value of the land itself. The assumption, based on the past experience of the cemetery, of a stable and continued rate of sales, as stated above, has a sound basis in view of the character of the business. (*Graceland Park Cemetery Co. v. City of Omaha* (1962), 173 Neb. 608, 114 N.W.2d 29.) As a result, projecting future earnings from the land provides a sound foundation for determining its value. To abandon those presumptions and interject speculation, based upon contingencies which might affect future earnings as to the remainder of the cemetery, would render the income formula too uncertain to safely be accepted as evidence of property value. *Cf. Chicago Land Clearance Com. v. Darrow* (1957), 12 Ill. 2d 365, 372-73, 146 N.E.2d 1 (net income from owner occupied premises too speculative).

■■ ■ Although we agree that the attractiveness or "advertisement" value of the parcel taken may be relevant to a determination of the value of that property, it cannot justify a change in the capitalization rate. As in the present case, the cemetery land taken in *Barbeau* was in the frontal area of the cemetery and among the most valuable in the park. The improved character of the lots taken justified a finding that the average net income per lot in that parcel would have been higher than the overall average for all the lots within the cemetery. We believe that to be a reasonable and accurate manner of compensating a claimant for an "improved" parcel. We additionally note that petitioner's appraisals included as an element of the valuation, the amount of value added by the improvements within the land taken.

■■ Having concluded that Henning's expert testimony was based upon an improper application of the income method of appraisal, namely the change in the capitalization rate, we, accordingly, hold that his testimony was properly excluded as a matter of law. Where an expert's opinion is based upon improper elements, his testimony is incompetent and may be excluded or stricken upon a proper motion. (*City of Chicago v. Giedraitis* (1958), 14 Ill. 2d 45, 150 N.E.2d 577; *Department of Public Works & Buildings v. Greenwell* (1977), 45 Ill. App. 3d 159, 359 N.E.2d 780.

Finally, we note an additional but related consideration which renders defendants' method of appraisal objectionable. By employing two different capitalization rates, Henning was, in effect, trying to estimate the effect of the condemnation of the *land not taken.* The 12% rate, used in measuring the value of the property remaining after the taking, was justified on the basis that the remainder was less valuable and

would produce less income than it would have prior to the taking. In other words, Henning was not only measuring the value of the property actually taken, but he was also attempting to estimate the *damage to the remainder* (*i.e.*, the land not taken but allegedly injured as a result of the condemnation).

From our examination of the cases, we have found no instance where the income approach was employed to measure consequential damages to the remainder of a cemetery. As we stated above, the income approach measures the reduced value of a cemetery in terms of its shortened economic life. The total number of grave sites (the inventory of the cemetery) has been depleted by a certain number. The calculated discount of the income that would have been received from the eventual sale of those lots represents the present value of the *land actually taken*.

■■ We do not mean to imply, however, that a partial taking of cemetery property will never result in injury to the land not taken. (See Highway Research Board Report 92, at 33-34 (1970); Nichols, The Law of Eminent Domain §12.32(4)(a), at 12—600 (3d ed. 1973).) We simply conclude that the income approach was not intended to be implemented as a method of valuing the damage to the remainder. We believe this conclusion is supported by the cases and authorities. Nichols, for example, in describing the final steps of the income method, states that the value of cemetery land after the taking, is determined by multiplying the net price per lot (which has been properly discounted by the appropriate Inwood Coefficient) by the number of remaining lots. From this figure the appraiser should deduct "such sums as are deemed a proper allowance for damages to the remainder." (Nichols, The Law of Eminent Domain §12.32(4)(a), at 12—600 (3d ed. 1973).) Nothing in that language or from the cases would suggest that damage to the remainder should be estimated by resort to the income approach. See also Highway Research Board Report 92, at 33-34 (1970).

■■ In Illinois, the measure of compensation for a partial taking requires (1) the placing of a value on the portion of the property condemned and (2) a determination of the damage, if any, to the remainder. (*County Board of School Trustees v. Elliott* (1958), 14 Ill. 2d 440, 152 N.E.2d 873.) The compensation is the sum of those two amounts. We conclude that the income approach provides a reasonably accurate measure of the value of the property actually taken.

Henning, by use of the 12% capitalization rate in measuring the value of the cemetery after the taking, in essence, combined the measure of value for land appropriated and a speculated estimate of the damage to the remainder. The inappropriateness of his method of valuing the portion of the cemetery actually taken is demonstrated by Henning's concluding testimony. Using the 10% rate to measure the value before

taking and the 12% rate to measure the value after taking, he concluded that the value of the *land taken* was $228,854. He then testified that, in addition to this amount, the taking also caused $43,447 "damage to the remainder." This latter figure was based on the plantings taken, damage to the entrance area and gate, damage to and replacement of parking and entrance pavement, relocation of the entrance sign, and restoration of the lawn.

■■ It is evident that the elements which entered into his appraisal of the damage to the remainder were the same elements he relied upon to justify the 12% capitalization rate used to measure the value of the land taken. Inclusion of these elements in first, determining the value of the land taken and again in the measure of damage to the remainder would result in a double award of damages. Such a duplication of compensation is prohibited. (*Peoria, Bloomington & Champaign Traction Co. v. Vance* (1908), 234 Ill. 36, 84 N.E. 607.) The defendants' particular adoption of the income method is, thus, similarly objectionable on this basis.

Defendants alternatively maintain that the petitioner did not object to the testimony of the defendants' expert regarding the change in the capitalization rate until after that concept had been presented to the jury. It is generally held that an objection to improper evidence must be made at the time of its admission. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817.) Nevertheless, an objection to improper evidence is timely as soon as the character of the objectionable testimony becomes apparent. *Weinzelbaum, Inc. v. Abbell* (1964), 49 Ill. App. 2d 442, 200 N.E.2d 43.

In this case, the defendants' expert first discussed the change in the capitalization rate during a general description of the income appraisal method. No objection was raised at that time. No specific foundation, however, was provided to substantiate the change and no capitalization rates were applied, at that time, to determine the value of the property taken.

Following a subsequent objection by petitioner and the examination of the witness by the court, outside the presence of the jury, the witness stated that he would apply different capitalization rates in measuring the before and after value of the property in question. Each time, thereafter, when defendants attempted to elicit foundation testimony regarding the change in rates, petitioner objected. After several objections were sustained the defendants made their offer of proof of Henning's testimony.

■■ It is evident from the record that the petitioner did not object when defendants' expert first testified generally regarding the change in the capitalization rate. Nevertheless, we conclude that the petitioner did object as soon as it became apparent that the defendants intended to rely

upon an objectionable and incompetent method of determining the value of the land taken. As such, we believe petitioner's objection to this testimony was timely. *Weinzelbaum.*

Defendants finally contend that the portion of their expert's testimony regarding the value of the damage to the remainder should have been submitted to the jury. Henning's testimony, however, that the remainder was damaged in the amount of $43,447 was made during the offer of proof concerning his method of applying the income approach of valuation.

■■ In determining the damage to the remainder, the owner has the burden of proving the damage. (*Department of Public Works & Buildings v. Finks* (1956), 10 Ill. 2d 15, 139 N.E.2d 267.) Having reviewed the record, it is apparent that the thrust of the tendered offer of proof by defendants was to support their theory that the use of different capitalization rates, for the before and after measures of value, was warranted. The defendants did not request the trial court to admit the relevant portion of the offer of proof for the limited purpose of showing damage to the remainder. Absent such a request by defendants, the trial court did not err in excluding the entire offer of proof.

■■ The defendants did not offer any other evidence concerning damage to the remainder of the cemetery. Consequently, the defendants, by failing to present evidence before the jury as to this element, did not sustain their burden of proof.

Based on the foregoing reasoning, we conclude, therefore, that the judgment of the trial court should be affirmed.

Affirmed.

MILLS and GREEN, JJ., concur.