74279. DEPARTMENT OF TRANSPORTATION v. JAMES
COMPANY, INC.
(360 SE2d 56)

McMURRAY, Presiding Judge.

The Department of Transportation (condemnor) filed a proceeding in rem, seeking to condemn land owned by The James Company, Inc. (condemnee) for the construction of a limited access highway along U. S. Highway 84 between Waycross, Georgia and Brunswick, Georgia. From an assessor's award of $12,580, condemnee appealed demanding a trial by jury as to the value of the property taken.

The evidence adduced at trial disclosed the following: In "early 1956" condemnee began operating a perpetual care garden type cemetery known as Greenlawn Cemetery located about five miles east of Waycross, Georgia on the south side of U. S. Highway 84.[1] Condemnee acquired the first parcel of real property for the cemetery in 1955 and by 1961 condemnee had acquired additional contiguous land, comprising 155.9 (155) acres.

On January 1, 1961, condemnee recorded in the Superior Court of Ware County, Georgia a document entitled: "A DEDICATION IN TRUST THE LANDS OF GREENLAWN CEMETERY." This document describes condemnee's entire 155-acre tract and provides as follows: "In response to the trust placed in us by our lot owners, and to comply with laws requiring dedication of cemetery property, we hereby dedicate the lands listed here as cemetery property and for no use except for the cemetery."[2]

Upon the date of condemnation, "12 to 14 acres" of condemnee's 155-acre tract had been developed and were available for interment. Of this area, approximately "3.8 acres" had been sold and comprised 3,821 burial spaces. Eleven to twelve acres of condemnee's property were open pasture which remained undeveloped and is used as a "buffer zone [to enhance] the appearance of the developed area." More specifically, this area "had not been designed or planned, it

---

[1] " 'Perpetual care' means the maintenance and the reasonable administration of the cemetery grounds and buildings in keeping with a properly maintained cemetery." OCGA § 44-3-131 (13).

[2] In conjunction with this dedication condemnee recorded a "TRUST AGREEMENT," which was executed by condemnee on February 4, 1956. This agreement provides an irrevocable trust which is funded by 10 percent of the gross proceeds from the sale of each cemetery lot or grave space. The income of this endowment is to be used for the perpetual care of the cemetery. In this regard, the Georgia Cemetery Act of 1983, OCGA § 44-3-130 et seq., now provides guidelines for establishing such trust funds for perpetual care cemeteries.

hadn't been cleared, it hadn't been grubbed, [it] hadn't been drained, roads hadn't been built . . . no irrigation [system had been installed, and] no grass had been planted . . ." Condemnee's remaining property consisted of about "128 acres" and included the land expropriated by condemnor. This area had not been platted as burial ground, it remained undeveloped and it was described as "woodlands." (Portions of this area had been planted by condemnee with pine trees 15 to 18 years earlier and some of the pine trees had been removed from the property and sold.)

Condemnor's acquisition comprised 6.508 acres of land which measured 4,902.5 feet along the south side of U. S. Highway 84 and varied in width from 36 to 90 feet. (1.1 acres of this land was a drainage area and was not suitable for cemetery purposes.) After condemnor's acquisition, condemnee's road frontage was substantially the same as before the acquisition and approximately 149 acres of condemnee's tract remained for future development.

The expert real estate appraisers for the parties were not in agreement as to the highest and best use of the condemned property. James Wigley testified for condemnor and concluded that the highest and best use for the condemned property was for the production of timber and he appraised the land for $4,172. Ralph Kirkpatrick, James Bailey and Tyson McClain testified for condemnee and appraised the condemned land for use as cemetery property. Kirkpatrick and Bailey appraised the land for $817,866. McClain appraised the land for $3 million.

Upon conclusion of the evidence, condemnor moved for a directed verdict. This motion was denied and the jury returned a verdict awarding condemnee $97,620. Condemnor now appeals. *Held*:

1. In support of its first three enumerations of error, condemnor argues that the testimony of condemnee's expert witnesses was speculative and did not relate to the value of the condemned land at the time of condemnation. From this argument, condemnor contends the trial court erred in failing to grant its motion for directed verdict and in failing to enter judgment based on James Wigley's valuation of the condemned property.

(a) First, we must determine whether the trial court erred in allowing the jury to consider the testimony of condemnee's expert witnesses regarding their valuation of the condemned property.

After a thorough examination of the testimony of condemnee's expert witnesses, it appears they adopted a theory of appraisal which views cemetery land as business capital which is in the form of fungible inventory. From this perspective, Kirkpatrick and Bailey appraised the condemned land by multiplying the sales price of a cemetery lot at Greenlawn Cemetery at the time of condemnation by the number of gravesites available in the condemned parcel of land. They

then deducted the costs for developing the land for cemetery purposes and arrived at a sum which reflected the value they placed on the condemned land. McClain's explanation of appraisal is more confusing. However, after examining his testimony, it appears McClain appraised the condemned land by applying a formula which is similar to the formula employed by Kirkpatrick and Bailey, modified to include anticipated revenues derived from the sale of items and services which are incidental to the procurement of a gravesite and are generally purchased by a cemetery customer.[3]

Although we find no cases in Georgia addressing the propriety of the appraisal theory upon which condemnee's expert witnesses based their formula for determining the value of the condemned land, other jurisdictions have confronted this appraisal theory and have approved "the so-called 'capitalization or St. Agnes formula' [for determining the value of unused cemetery land], under which the net sales price of lots already sold in the affected cemetery area, and in the adjoining cemetery sections, is applied to the number of lots taken." 42 ALR3d 1314, 1317 § 2 (a), 1318. See *St. Agnes Cemetery v. State of N. Y.*, 3 NY2d 37 (143 NE2d 377). See formula applied in *State Hwy. Dept. v. Baxter*, 111 Ga. App. 230, 232 (141 SE2d 236). A refined version of this formula is known as the "income method" of valuing cemetery property and has been defined as follows:

"The income method of valuing property having a highest and best use for cemetery purposes considers the property as an inventory of fungible gravesites, the supply of which diminishes over a period of years as the land is used and the inventory is exhausted by sales. The value of the gravesites is computed by finding the net annual sales after deducting the cost of improvements and projecting this sum over the life of the cemetery. The result is capitalized and then discounted, much as an annuity, to give it a present value reflecting the fact that the judgment against the state awards claimant dollars in hand in exchange for dollars expected from sales anticipated in the future (cf. also 4 Nichols on Eminent Domain (3d ed.), § 12.32 (4) (a) (i); Annot. Condemnation-Cemetery Lands, 42 A.L.R.3d 1314). In the case of a partial taking, the capitalized present worth of the cemetery is measured by this formula before and after taking to determine claimant's damages (*Diocese of Buffalo v. State of New York*, 24 N.Y.2d 320, 300 N.Y.S.2d 328, 248 N.E.2d 155). The theory is that

---

[3] The combined testimony of the parties' expert witnesses revealed that one acre of condemnee's land would yield from 850 to 1,500 gravesites. At the time condemnee's property was taken by condemnor, the purchase price of one grave lot, if purchased before it was needed, was $250. If a grave lot was purchased for immediate use, the purchase price was $300. (The purchase price of a grave lot at condemnee's cemetery was below the purchase price of a grave lot at similarly situated cemeteries in the region.)

partial appropriation of cemetery land merely removes the number of graves available for sale at some future time, shortening the cemetery's economic life." *St. James Roman Catholic &c. Society v. State of N. Y.*, 50 AD2d 193 (376 NYS2d 347, 350-351).

The "income method" for valuing cemetery property reflects a view which characterizes unused cemetery land as inventory with a *future market* and accordingly discounts its capital value in order to reflect the present value for condemned cemetery property. In comparison, the formulas applied by condemnee's expert witnesses in the case sub judice do not reflect the actual "cash-in-hand" value of the condemned property because a discount rate is not provided therein which is based on the projected rate of capital recapture. This omission resulted in use of appraisal formulas by condemnee's expert witnesses which valued the condemned land as inventory with an *immediate market*. This position is entirely unrealistic since the large amount of land available in condemnee's cemetery translates into an extremely large inventory of gravesites; which, when combined with the historically slow rate of sales at Greenlawn Cemetery, results in a practically endless supply of grave lots for the local market. (Condemnor's expert witness testified that condemnee's cemetery had a potential for 155,900 gravesites and, after applying a projected rate for sales which exceeded condemnee's past yearly sales rate, he estimated the life of Greenlawn Cemetery at 760 years.) From this analysis, it is apparent that the conclusions of condemnee's expert witnesses were speculative and did not accurately reflect the value of the condemned property at the time of condemnation. Consequently, the trial court erred in allowing the jury to consider the testimony of condemnee's expert witnesses regarding their appraisal of the condemned land.

(b) Next, we must determine whether the trial court erred in failing to enter judgment based on the appraisal of James Wigley, condemnor's expert witness.

James Wigley testified that he appraised the condemned property as timberland, a use which resulted in a low valuation, because it was dedicated as cemetery property and could not be developed for what he testified was the highest and best use for the land, "rural residential." Wigley further testified that use of the condemned land for cemetery purposes was not its highest and best use because the large volume of gravesites available at Greenlawn Cemetery combined with the projected slow rate of sales resulted in an appraisal for the condemned land which was less than his appraisal of the land based on its use for the production of timber.

In *Buffalo Burial Park Assn. v. State of N. Y.*, 24 NY2d 320, 328-329 (248 NE2d 155), the Court of Appeals of New York was confronted with a similar problem as it related to undeveloped cemetery

land and it held that the value of the land should be determined on the basis of a highest and best use for other than cemetery purposes. Adopting this approach in the case sub judice, since condemnor's expert witness testified that the condemned land would appraise at a higher value for use other than cemetery purposes, the trial court did not err in failing to enter judgment in favor of condemnor based on Wigley's valuation of the land for the production of timber. On the contrary, under the circumstances described by condemnor's expert witness, condemnee should be allowed, as a minimum, to recover the fair market value of the condemned land based on its highest and best use for other than cemetery purposes. See *St. James Roman Catholic &c. Society v. State of N. Y.*, 50 AD2d 193 (376 NYS2d 347, 352, 353), supra. Consequently, in the case sub judice, since neither condemnor nor condemnee presented competent evidence regarding the value of the condemned land for such "other" use, a new trial is required to determine condemnee's just compensation.

2. In light of our holding in Division 1 of this opinion, the issues raised by condemnor in its remaining three enumerations of error have either been resolved, are rendered moot or are unlikely to reoccur upon retrial.

*Judgment reversed. Sognier and Beasley, JJ., concur.*

DECIDED JULY 13, 1987 —
REHEARING DENIED JULY 24, 1987.

*J. Thomas Whelchel*, for appellant.
*C. Edwin Rozier*, for appellee.