THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. ADAM R. THILL, Defendant-Appellee.

Second District    No. 2—97—0104

Opinion filed June 4, 1998.

BOWMAN, J., dissenting.

Joseph E. Birkett, State's Attorney, of Wheaton (Margaret M. Healy and Neal F. Thompson, Assistant State's Attorneys, of counsel), and Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of Elgin, for the People.

Donald J. Ramsell and Philip M. Dolci, both of Ramsell & Armamentos, of Wheaton, for appellee.

JUSTICE THOMAS delivered the opinion of the court:

The defendant, Adam R. Thill, was charged with driving under the influence of alcohol (625 ILCS 5/11—501(a)(2) (West 1996)) and driving with a breath-alcohol concentration in excess of .10 (625 ILCS 5/11—501(a)(1) (West 1996)). The defendant's driving privileges were statutorily suspended after he submitted to a breath test, which revealed a blood-alcohol concentration of .11. The defendant filed a peti-

tion to rescind the statutory summary suspension of his license. The trial court granted his petition. The State appeals. We reverse.

Illinois state trooper Emmet Clifton testified at the defendant's rescission hearing that on October 21, 1996, at approximately 3:55 a.m., he stopped the defendant's vehicle for a traffic violation on westbound I-88. The trooper had observed the defendant's car weaving between several lanes and the shoulder of the highway. He followed the car for about one mile and saw it weave several times. After he stopped the defendant and approached him, the trooper noticed that the defendant had bloodshot and glassy eyes, slurred speech, and a strong odor of alcohol on his breath. The defendant then proceeded to fail four field-sobriety tests. Trooper Clifton was of the opinion that the defendant was under the influence of alcohol. Clifton transported the defendant to a police facility where the defendant submitted to a breath test at 4:43 a.m., which revealed that his blood-alcohol level was .11.

The defendant testified that he suffers from asthma and that he used a Ventolin inhaler on the night in question at about 6 p.m., 10 p.m., 3:15 a.m., and right before he was stopped by Trooper Clifton. The defendant denied that he was under the influence of alcohol.

Emmet Harmon testified as an expert on behalf of the defendant regarding the effect of albuterol on the breathalyzer used to test the defendant's breath, the Intoxilyzer 5000. Albuterol is an ingredient in the Ventolin inhaler used by the defendant. Harmon stated that the Intoxilyzer 5000 operates on principles of infrared absorption. Under this theory, organic substances absorb particular wavelengths of infrared light. The amount of absorption is proportional to the concentration of the substance in the path of the infrared light. According to Harmon, ethanol and albuterol fall within the same hydroxyl group tested by the machine, and it cannot differentiate between the hydroxyl compounds of ethanol and albuterol.

Harmon further testified that there are 81 cubic centimeters of air in the air chamber of the Intoxilyzer 5000. He stated that "through some mathematical technique" that amount is calculated to .10 grams of alcohol per 210 liters of breath. He then stated that .0000385 grams of an alcohol compound in 81 cubic centimeters of air would be equal to .10 grams of an alcohol compound in 210 liters of air. In other words, slightly less than four one-hundred-thousandths of a gram of alcohol would be equal to a .10 reading if it was placed inside the chamber of an Intoxilyzer 5000. Harmon indicated that .000038 grams is equal to 38 micrograms. Harmon then noted that 90 micrograms of albuterol are distributed in a person's lung chamber with one spray from a Ventolin inhaler. The maximum lung retention period for albuterol is approximately two to four hours. Harmon testified that, within

a reasonable degree of analytical and chemical certainty, after subtracting any albuterol that measured on the Intoxilyzer 5000 the reading would not have equaled or exceeded .10. The State objected to Harmon's opinion, arguing that it lacked foundation. The trial court overruled the objection.

On cross-examination, Harmon testified that the Intoxilyzer 5000 calculates the concentration of a compound in the air chamber based on the infrared absorptivity unique to the particular compound in the chamber. The machine is designed to make its calculation based specifically on the absorptivity of ethanol, a factor that is programmed into the instrument by calibration. Harmon admitted that ethanol has a specific infrared absorptivity that is different from the absorptivity factor for albuterol. Harmon acknowledged that he did not know the absorptivity factor for albuterol.

Harmon further testified on cross-examination that the partition ratio has an effect on the calculation made when albuterol is in the chamber of the Intoxilyzer 5000. The ratio is the factor used to convert breath-alcohol concentration to blood-alcohol concentration. Harmon conceded that the partition ratio for ethanol is 2,100 to 1, is unique to ethanol, and is programmed into the computer. He acknowledged that, if a different substance was in the machine with a different partition ratio of, for example, 1 to 1, the machine would be in error by a factor of 2,100. Harmon admitted that he did not know the partition ratio for albuterol. On redirect examination, Harmon explained that the machine reads albuterol as ethanol and would use the partition ratio of ethanol in its calculation. He further noted that the partition ratio for albuterol is not a factor because it relates to the amount of albuterol in the blood and the Intoxilyzer 5000 only reads the albuterol that is introduced into the lungs as if it were ethanol.

During the course of Harmon's testimony, the defendant introduced into evidence defendant's exhibit No. 3, the manufacturer's product information insert for albuterol. The insert prescribes that patients take no more than a two-spray dose every four to six hours. About 90 micrograms of albuterol are dispensed in a single spray. The insert notes that 72% of the inhaled dose is eliminated in the urine within 24 hours. It also notes that animal studies show that albuterol does not pass the blood-brain barrier.

The trial court granted a motion by the defendant to strike certain questions asked and answers given during the State's cross-examination of Harmon. The defendant had argued that the State was unable to prove up the facts inferred from the State's cross-examination of Harmon. The trial court also sustained the defendant's objections to the State's arguments regarding the stricken testimony

and prohibited the State from further arguing the lack of proper foundation for Harmon's opinion testimony. After hearing all the remaining evidence and considering the closing arguments, the trial court granted the defendant's petition to rescind the statutory summary suspension of his driving privileges.

On appeal, the State argues that (1) the trial court erred in striking evidence in the record that showed that Harmon's opinion testimony lacked an adequate foundation; (2) absent the requisite foundation, Harmon's opinion should have been excluded; and (3) given the inadmissibility of Harmon's opinion, the trial court erred in rescinding the statutory summary suspension of the defendant's driving privileges.

■■ The admission of expert testimony is a matter within the discretion of the trial court (*People v. Contreras*, 246 Ill. App. 3d 502, 510 (1993)), and its decision in that regard will not be disturbed absent an abuse of discretion (*People v. Kane*, 223 Ill. App. 3d 377, 383 (1991)). However, if an expert's opinion is based upon improper elements, it may be excluded or stricken. *Department of Transportation v. Bouy*, 69 Ill. App. 3d 29, 38 (1979). The trial court has a responsibility to determine whether the underlying facts or data upon which an expert bases an opinion are of a type reasonably relied upon by experts in the particular field. *City of Chicago v. Anthony*, 136 Ill. 2d 169, 185 (1990). Expert opinion that is based upon unreliable data and procedures is inadmissible; a court must critically evaluate the reasoning process by which experts connect data to their conclusions. *O'Connor v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1395 (C.D. Ill. 1992). For these reasons, wide latitude is allowed in the cross-examination of an expert witness. See *People v. Buggs*, 112 Ill. 2d 284, 290 (1986). The burden of establishing an expert's qualifications and that the scientific theories he relies upon are generally accepted in the relevant field rests with the proponent. *Kane*, 223 Ill. App. 3d at 384-85. There must be a sound explanation as to the manner in which the expert opinion was arrived at for it to be admissible. See *Kane*, 223 Ill. App. 3d at 385-86.

■ Applying the above-mentioned principles to the facts of the case at bar, we find that the trial court erred in striking the State's cross-examination of Harmon. Harmon testified on direct examination that the Intoxilyzer 5000 operates on a theory of infrared absorption, which involves the passage of infrared light through organic substances in the infrared light path. The organic substances absorb particular wavelengths of infrared light, and the amount of absorption is proportional to the concentration of the substance in the path of infrared light. Harmon noted that the instrument is programmed based on

the known absorptivity factor for ethanol. On cross-examination, Harmon acknowledged that he did not know the absorptivity factor for albuterol but that he did know it was different from that of ethanol. Harmon never fully explained how it was possible that given the different absorptivity rates of the two substances he could nevertheless calculate the extent to which any albuterol in the defendant's system would have affected the reading given by the Intoxilyzer 5000. We find that this was a proper subject of cross-examination and was properly argued by the State as a basis for attacking the foundation for Harmon's ultimate opinion that, subtracting any albuterol that measured on the machine, the reading would not have been equal to or exceeded .10.

Likewise, we find that the trial court erred in striking the State's cross-examination of Harmon with respect to the partition ratio for albuterol. Harmon acknowledged that, if a compound in the chamber had a partition ratio of 1 to 1, the machine would give a reading in error by a factor of 2,100. Harmon admitted that he did not know the partition ratio for albuterol. He explained on redirect examination that the machine would read albuterol as if it were ethanol and that the partition ratio was not a factor here because it refers to the amount of albuterol in the blood and in this case the albuterol was only in the defendant's lungs. Even if we were to view Harmon's testimony on redirect as satisfactorily explaining the issues raised by the State with respect to the partition ratio on cross-examination, we would still find that the State was entitled to ask the questions relating to the partition ratio. The State was entitled to test the witness's expertise in the area and the process by which he attempted to connect the data to his conclusion. This was not a situation, as the defendant suggests, of the State suggesting a fact and then being unable to prove it. To the extent that Harmon's answers to this area of questioning were vague or unsatisfactory, it would affect the credibility of his testimony and could compel a finding that his opinion lacked an adequate foundation.

■ We next turn to the issue of whether Harmon's opinion should have been excluded because it lacked the required foundation. In that regard, we note that Harmon attempted to show that the reading given by the machine was affected by the albuterol inhaled by the defendant by comparing the fact that 38 micrograms of ethanol in the machine would give a .10 reading and that in this case the defendant had inhaled two sprays of albuterol at 90 micrograms each. Harmon testified that albuterol is a crystalline solid that works locally by adhering to the muscles within the bronchial tubes and relaxing those muscles. A portion of the albuterol makes its way out of the lungs and

into the air chamber of the Intoxilyzer 5000. He never explained, however, what portion or percentage passed out of the lungs through exhalation and what percentage remained in the body. Moreover, he had testified that whatever portion of albuterol remained in the lungs would only be there at a maximum of between two and four hours. The defendant's breath test was taken at 4:43 a.m., almost an hour after he last claimed to have inhaled albuterol. Parenthetically, we note that the defendant's claim that he last sprayed the Ventolin inhaler just before being stopped is highly incredible since his last spray before that time had been only 40 minutes earlier, even though proper use of the drug called for a dosage every four to six hours. Nonetheless, even assuming that the defendant had a dosage about one hour prior to his test, some of the albuterol would have already been eliminated from his system. The two- to four-hour figure testified to by Harmon was a maximum time limit that any albuterol would remain in the system. Also the product insert indicates that 72% of the drug leaves the system by way of urination. That leaves only 28% left that could possibly be eliminated by way of respiration. Moreover, Harmon's testimony seems to presume that the total amount of albuterol that went into the defendant's lungs from the initial spray also entered the chamber of the Intoxilyzer 5000 in a single breath. Given these serious flaws in the basis for Harmon's opinion, we find that the trial court erred in failing to strike Harmon's opinion that, subtracting any albuterol that measured on the Intoxilyzer 5000, the reading would not have equaled or exceeded .10.

A summary suspension rescission hearing is a civil proceeding in which the motorist bears the burden of proof to establish a *prima facie* case for rescission. See *People v. Orth*, 124 Ill. 2d 326, 337-38 (1988). The burden is on the defendant to present a *prima facie* case that the test result was unreliable. *People v. Miller*, 219 Ill. App. 3d 246, 248 (1991). Elements of a *prima facie* case attacking a breathalyzer test result as unreliable include whether the test was properly administered by the breathalyzer operator, whether the result was accurate and trustworthy, and whether the Department of Public Health rules were violated. *People v. Easterly*, 264 Ill. App. 3d 233, 235 (1994). Absent proof of these factors, a motorist fails to establish a *prima facie* case for rescission of his suspension. *Easterly*, 264 Ill. App. 3d at 235.

Without Harmon's opinion, the defendant failed to meet his burden of proof that the statutory summary suspension of his license should have been rescinded. The defendant took the test and his blood-alcohol concentration was found to be .11, creating a presumption that he was under the influence of alcohol. See 625 ILCS 5/11—501.2(b)(3)

(West 1996); *People v. Franciskovich*, 202 Ill. App. 3d 693, 694 (1990). This was supported by the defendant's erratic driving before being stopped, his subsequent failure of several field-sobriety tests, and the arresting officer's observation of glassy eyes, slurred speech, and a strong odor of alcohol. As we previously noted, albuterol does not cross the blood-brain barrier, so any inhalation of the substance would not have impacted on the defendant's failure of the field-sobriety tests and his erratic driving. Accordingly, we find that the trial court's order rescinding the defendant's statutory summary suspension was against the manifest weight of the evidence.

For the foregoing reasons, we reverse the judgment of the circuit court of Du Page County that rescinded the defendant's statutory summary suspension, and we remand the cause for further proceedings consistent with this opinion.

Reversed and remanded.

GEIGER, P.J., concurs.

JUSTICE BOWMAN, dissenting:

I respectfully dissent from the majority's conclusion that the trial court erred when it failed to strike Harmon's opinion that "subtracting any albuterol that measured on the Intoxilyzer 5000[,] the reading would not have equaled or exceeded .10" (297 Ill. App. 3d at 10). The majority reaches this conclusion by reviewing Harmon's complex scientific testimony and then playing the role of a fact finder. I simply do not agree with the majority's approach, and I believe that any deficiencies in Harmon's testimony were a matter for the trial court to consider. Accordingly, I would affirm the trial court's decision to admit Harmon's expert testimony.

It is well settled that an expert's opinion is only as valid as the bases for that opinion. *Gyllin v. College Craft Enterprises, Ltd.*, 260 Ill. App. 3d 707, 715 (1994). An expert is a witness who, because of his education, training, or practical experience, possesses knowledge beyond that of the average person. *People v. Novak*, 163 Ill. 2d 93, 104 (1994). The decision to admit an expert's testimony lies within the sound and wide discretion of the trial court. *People v. Eyler*, 133 Ill. 2d 173, 211 (1989). It is a well-established principle of appellate review that this court does not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *People v. Van Brocklin*, 293 Ill. App. 3d 156, 165 (1997).

In this case, the majority criticizes Harmon for never explaining

what portion of albuterol exits the body through exhalation and what portion of albuterol remains in the body. Given the sequence of events on the night in question, Harmon's testimony that any albuterol would remain in defendant's lungs for between two and four hours, and information from the product insert, the majority concludes that "some" of the albuterol defendant inhaled would have already been eliminated at the time of the test. Based on its own interpretation of the facts, the majority is then able to conclude that Harmon's testimony was filled with "serious flaws" and not credible on appeal. In other words, by merely reading the record, the majority is able to contradict Harmon's conclusion and the trial court's determination regarding the amount of albuterol in defendant's system and its effect on the Intoxilyzer.

As is apparent, the majority's analysis is based on its reading of Harmon's testimony and its credibility determinations of Harmon and defendant. These types of decisions are simply not the responsibility of this court. Harmon's testimony was highly technical and certainly beyond the ken of the average person. His testimony was properly admitted because it would assist the trier of fact in the determination of a fact at issue, namely, the effect of albuterol on the Intoxilyzer reading. His opinion that the reading would be lower than .10 if the albuterol were to be subtracted was based on his knowledge and practical experience. Once he offered his opinion, the trial court had the discretion to determine whether that opinion was properly based in fact. It was also within the trial court's discretion to weigh the value of that opinion as well as the credibility of Harmon and defendant. Because the majority has usurped the trial court's role regarding the weighing of evidence and the determination of witness credibility, I dissent.